**UNITED STATES of America,**
**Appellant,**

**v.**

**STAR-KIST FOODS, Inc. (formerly The French Sardine Company of California), Appellee.**

**No. 14794.**

United States Court of Appeals
Ninth Circuit.

Sept. 21, 1956.

H. Brian Holland, Asst. Atty. Gen., Harry Marselli, Ellis N. Slack, Robert N. Anderson, Charles B. E. Freeman, Dept. of Justice, Washington, D. C., and Laughlin E. Waters, U. S. Atty., Edward R. McHale, Robert H. Wyshak, Asst. U. S. Attys., Los Angeles, Cal., for appellant.

Mackay, McGregor, Reynolds & Bennion, A. Calder Mackay, Arthur McGregor, Adam Y. Bennion and Stafford R. Grady, Los Angeles, Cal., for appellee.

Before FEE and CHAMBERS, Circuit Judges, and FOLEY, District Judge.

JAMES ALGER FEE, Circuit Judge.

This controversy arises from the fact that Star-Kist Foods paid to the United States in settlement of an alleged OPA violation and claimed a deduction therefor as an ordinary and necessary business expense under Section 23(a) (1) (A) of the Internal Revenue Code, 26 U.S.C.A. § 23(a) (1) (A). The deduction was disallowed and the amount of the difference collected. Star-Kist brought suit against the United States. The trial court found under the facts in the record that the amount was deductible and granted judgment for Star-Kist.

The facts found by the trial court are summarized below.

Since incorporation in 1917, Star-Kist[1] has been engaged in the fish cannery business. It purchases raw fish by the ton from fishermen, cans the proper portions thereof and sells the canned product through brokers to its customers. The latter resell the cans of fish to consumers at retail.

The Office of Price Administration in 1942 issued a regulation which fixed the price at which fish canners could sell tuna at the same price at which each had sold this product during the month of March, 1942. However, Star-Kist had not sold fancy light meat tuna during that month. Under this regulation, Star-Kist was compelled to adopt as its ceiling for that commodity the price charged during March, 1942, by its nearest competitor. There was an internal dispute among the officials of Star-Kist as to who was the nearest competitor. Apparently, through patriotic motives and despite advice of counsel to the contrary, Star-Kist unfortunately adopted the lowest price in the industry, which was $11 per case on fancy light meat tuna, basis 48½'s. This was the price charged by Van Camp Sea Food Company. The High Seas Tuna Company, which may have been more nearly analogous to Star-Kist, charged on the same basis $14 per case, which was the highest price in the industry.

Owing to the confusion existing in the price fixing field, no ceilings were established by the agency. As a result, the price of raw fish, which was the material required for canning by Star-Kist and other concerns, rose continuously during the year 1942. The widely varying ceiling prices for canned fish on the market and the lack of any control of the basic material, raw fish, were recognized as arbitrary by the agency officials. The situation in which Star-Kist was found was held to be grossly inequitable to it.

Immediately after the situation was apparent early in 1942, Star-Kist carried on an extensive correspondence with the Los Angeles office and the Washington office of the Office of Price Administration and particularly with the fish section thereof. During the course of the negotiations, Mr. Triggs, head of the fish section, proposed to remedy the situation by issuing a regulation fixing the price at which all canners would be required to sell the same product and also by fixing a ceiling price upon raw fish. Star-Kist, by its sales manager, A. T. Williams, kept in touch with the agency officials in Washington during the summer and fall of 1942. Several trips to

1. Formerly The French Sardine Company of California.

Washington were made by representatives of the canners to confer with Mr. Triggs, and there were many telephone conversations with the same officer in Washington. Triggs advised the canner that a new regulation fixing the price at which all canners would be required to sell the same produce would be issued momentarily. The agency was constantly advised by Star-Kist of its disappointment at the inability of the agency to arrive at a stabilizing and equalizing price on canned tuna. The confusion and overwork in the agency are perfectly apparent from the correspondence. Triggs, as head of the fish section, gave Star-Kist reason to believe that the expected new dollars and cents ceiling price for fancy light meat tuna would be $12 per case, basis 48½'s. In the late summer or fall of 1942, the agency fixed new ceilings on several canned fish products, but these did not affect canned tuna. As a result of waiting on the action of the agency, Star-Kist accumulated a large inventory of this product. Therefore, its cash position was extremely low because its expenditures averaged about $235,000 per week during the sardine season months of October, November and December. Star-Kist again consulted the agency and Mr. Triggs, and was advised that the expected new ceiling on tuna would be issued shortly. The court found that Triggs advised "that inasmuch as OPA was allowing increased prices on other canned fish, plaintiff would not be taking any chances by raising its price; that he (Triggs) would support anything plaintiff might do within reason." Thereupon, Star-Kist, after taking advice of counsel and beginning with September 24, 1942, invoiced its customers at the price which it expected the regulation to be issued, namely $12 per case of fancy light meat tuna, basis 48½'s. On each of the invoices, the following notation was placed:

"Please remit in accordance with this invoice. If OPA fails to promulgate an order stabilizing or equalizing prices on the products covered on or before October 31, we agree to revert back to our March ceilings, which are $1.00 per case less on 48½'s and $2.00 per case less on 48/1's, and will refund you accordingly."

Star-Kist likewise sent an announcement in mimeographed form to all of its customers on that day explaining the action it had taken and advised Mr. Triggs, of the fish section, to the same effect. However, the agency did not issue the new regulation until January 7, 1943, at which time the ceiling price was fixed as above at $12 per case for fancy light meat tuna, basis 48½'s. Notwithstanding the situation thus developed largely by the fault of the agency, the enforcement office thereof began an investigation into the sales made by Star-Kist of canned tuna from September 24, 1942, until the new regulation was issued on January 7, 1943. Conferences were held between the officers of Star-Kist and the enforcement officials of the agency. The latter insisted that Star-Kist had violated the general maximum price regulation and had overcharged its customers $97,215 on sales of canned tuna, and insisted upon payment of this amount. In view of the confusion existing in its own office and the representations which had been made by officials of the agency, the enforcement officers offered to compromise in the event the taxpayer would pay the principal amount into the Treasury of the United States, and thereby conceded that Star-Kist had not been engaged in any willful violation and that the responsible officers of the agency had caused the situation. It was likewise thereby found by the agency that there had been no lack of reasonable precautions upon the part of the taxpayer. The action of the Los Angeles enforcement officials in accepting single damage instead of suing for treble damages was approved in the Washington office of the agency by Herman A. Greenberg, at that time chief of enforcement of the meat and dairy products of the Food Enforcement Branch of the OPA. This action was taken after investigation including a review of the correspondence between

Star-Kist and Triggs and a conference with Triggs in Washington. It was thus considered that the violation of Star-Kist was inadvertent and not willful and that it had acted in good faith and had taken reasonable precautions to comply with law.

██ Star-Kist made the payment in the amount of $97,215 and signed a waiver of answer and a consent judgment in an action to restrain future violations in which judgment was thereafter entered in the United States District Court. Thereafter, Star-Kist, on its tax returns for the taxable year ending May 31, 1943, deducted the amount so paid as an ordinary and necessary business expense. The Commissioner of Internal Revenue disallowed the amount as a deduction and assessed additional taxes against the company. This additional tax was paid in July, 1948. A claim for refund was filed, and, when no refund was made, Star-Kist commenced this suit in February, 1952. The case was heard on the records and considerable testimony, and Mr. Triggs, above referred to, was one of the witnesses together with other government officials and officers of the company, who testified as to the facts above outlined. Other voluminous correspondence was also introduced between the officials of Star-Kist and the officials of the government. At the conclusion of the case, the trial judge found as a fact that the amount deducted was not a penalty, but was an ordinary and necessary business expense in settlement of the alleged price violation and that this technical violation was made under circumstances inconsistent with an intent to violate the law and inconsistent with the lack of due care to conform to law. This was purely a question of fact, which the trial judge has found against the contention of the government. The deduction did not frustrate the purposes of the statute or sharply defined legislative policy. The contention of the government is that, because there was a technical violation, notwithstanding all the representations and promises of the officers of the government, the tax deduction cannot be allowed. This is in the face of the fact that Mr. Triggs testified that, owing to all the circumstances, if he had his say about it, he would have returned the money. This is an admission as to the utter inequity of this exaction in the first place. Of course, such an admission does not bind the government. But, on the other hand, it does not justify the failure to allow the deduction. The findings of the trial court were reasonable and are not clearly erroneous. Therefore, it must be held that Star-Kist carried the burden of proof as to the essential facts for a judgment in its favor. The discussions going on at all times between the parties indicated the immediate establishment of a higher ceiling than they had been allowed, because the prior price, set through apparently patriotic motives, had proved inadequate due to the failure of the agency to set a price upon raw fish. Everyone connected with the agency both in Los Angeles and Washington agreed that good faith was shown in the fact that Star-Kist, when they billed the goods through their brokers, stated that, if the OPA should not recognize the price charged as the basic price, refunds would be made. The evidence shows that at all times it was expected the regulation would be changed and the change would be made retroactive, which the agency had a right to do. The confusion and overwork in the agency prevented the responsible officials from making the change as early as expected, and, when it was finally drafted, contrary to the representations made, the clause to make the regulation retroactive was omitted.

██ The Court is of the opinion that the enforcement of the overcharge under all the circumstances by a payment to the government was in itself an injustice and an indication of a crusading zeal which too often characterized this agency. The evidence shows and the trial court found that Star-Kist had reasonable grounds to believe that ceiling conformable to the discussions which had been going on informally between it and responsible government officials would be

established and would be made retroactive, in order to free from any grounds for refund to the government the charges which were made by officials of the agency who promised Star-Kist protection. The facts which are found in detail are clearly correct and justify the conclusion of the trial court.

The judgment is affirmed.