COMMISSIONER OF INTERNAL REV-
ENUE v. PACIFIC MILLS.

No. 4700.

United States Court of Appeals
First Circuit.

Oct. 1, 1953.

I. Henry Kutz, Sp. Asst. to Atty. Gen., Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., and Ellis N. Slack and Lee A. Jackson, Sp. Assts. to Atty. Gen., Washington, D. C., on the brief), for petitioner.

Randolph E. Paul, Washington, D. C. (Louis Eisenstein, Washington, D. C., on the brief), for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

On this petition for review of a decision of the Tax Court of the United States we are concerned with an asserted deficiency of about one and one half million dollars in Pacific Mills' excess profits tax for the calendar year 1944. The only question necessary for decision in the view we take of the case is the one decided and answered in the affirmative by the Tax Court. That question is whether a payment of something over two million dollars made by the taxpayer on November 22, 1944, to the Office of Price Administration in settlement of claims for overcharges in the price of certain fabrics manufactured and sold by the taxpayer for civilian use is deductible as an ordinary and necessary business expense under § 23(a)(1)(A) of the Internal Revenue Code.[1]

Pacific Mills is a Massachusetts corporation which files its tax returns on the calendar year-accrual basis with the Collector of Internal Revenue for the District of Massachusetts. It has been engaged for over a century in the business of manufacturing woolen and worsted fabrics in Massachusetts. (In recent years it has also manufactured other textiles both in Massachusetts and elsewhere.) During the war years a large part of its production consisted of military fabrics, but it still continued to produce a substantial amount of woolen and worsted fabrics for civilian use. All of these were sold to buyers for use or consumption in their trade or business.

When Maximum Price Regulation 163, which was issued pursuant to the Emer-

---

1. "§ 23. Deductions from gross income.
 "In computing net income there shall be allowed as deductions:
 "(a) Expenses.
 "(1) Trade or business expenses.

"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." 53 Stat. 12, 56 Stat. 819, 26 U.S.C. § 23(a) (1) (A).

gency Price Control Act of 1942, 56 Stat. 23, 50 U.S.C.A.Appendix, § 901 et seq., went into effect on June 22 of that year, Pacific Mills made a serious effort to comply. Its president directed the vice president in charge of its worsted division to supervise compliance, and he was assisted by about twelve other officers and employees including the comptroller, the general manager of the woolen and worsted division, the head of that division's cost and accounting department and two of the latter's top assistants. They carefully studied the regulation itself, and its accompanying Statement of Considerations and press release, and when in December 1942 two representatives of OPA reviewed Pacific Mills' ceiling prices the only error they found was one in computation which made the taxpayer's calculation of profit ratio too low.

Later on, however, a serious disagreement over the interpretation of Regulation 163 developed between OPA and Pacific Mills. The details of that disagreement are fully set out in the findings of fact and opinion of the Tax Court. 17 T. C. 705. We need not recapitulate those details here. It will be enough for our purpose to mention only certain events which took place in the course of negotiations leading up to the settlement of the disagreement and some of the terms of the settlement itself.

About the first of October, 1944, the local enforcement attorney for OPA initiated a thorough investigation of the taxpayer's pricing methods. From that time until November 22, when the controversy between OPA and the taxpayer was finally settled as will appear presently, the representatives of the taxpayer and OPA officials met approximately twenty-five times. From the outset the conferees disagreed as to the interpretation of MPR 163. Their respective contentions are discussed in detail by the Tax Court. It will suffice to say here that on October 16, 1944, the taxpayer ceased billing its customers pending a resolution of its controversy with OPA, and that four days later at another con-

ference the regional enforcement attorney for OPA said that in his opinion the taxpayer had not taken all practicable precautions to comply. Wherefore he said that pursuant to OPA policy he would have to insist upon a settlement in excess of single damages for the period of one year prior to bringing suit, to which at that time his recovery would otherwise be limited by the "Chandler defense," so called, embodied in the amendments made in the Emergency Price Control Act of 1942 by the Stabilization Extension Act of 1944, 58 Stat. 632, which had gone into effect on June 30 of that year. In addition the regional enforcement attorney at the same conference also insisted that the taxpayer would have to agree to full compliance in the future with the regulation as OPA interpreted it, and that such an agreement would have to be embodied in some sort of a court order. It does not appear that any official of the taxpayer ever conceded that there had been any failure on their part to take practicable precautions. Nevertheless at the conference referred to above the taxpayer's principal negotiator agreed to "go along with a settlement," on the basis outlined by OPA, and he also agreed to have a computation made of the taxpayer's overcharges from June 22, 1942 to October 16, 1944, figured on the basis of OPA's interpretation of the regulation.

Approximately ten days later, at another conference, the local enforcement attorney for OPA again asked if the taxpayer was prepared to settle on the basis of OPA's interpretation of the regulation, and consent to an injunction against future violations and a money judgment in an amount equal to all asserted overcharges from the time of first figuring ceiling prices, which, necessarily, would be in an amount in excess of the asserted overcharges for the preceding year. The taxpayer's negotiators agreed, and on November 15 submitted a schedule of all alleged overcharges. This computation showed that on OPA's interpretation of Regulation 163 Pacific Mills had overcharged its customers $2,-

065,842.02 from June 22, 1942 to October 16, 1944, when it stopped billing its customers. The OPA officials estimated that a little less than $1,800,000 of that amount was attributable to overcharges during the year preceding the entry of any action which might then be brought.

A week later, on November 22, OPA officials and counsel for Pacific Mills appeared in the United States District Court for the District of Massachusetts with a complaint, an answer, a stipulation for judgment and a judgment. The court was presented with the above documents and informed that there had been a controversy between the parties, and that a settlement had been agreed upon requiring the payment of a sum of money to OPA and an injunction against future violations, wherefore a bill of complaint was to be filed so that an injunction might issue and a money judgment might be entered. There was no discussion with the court of the issues in controversy between the parties. After about fifteen minutes with the court, taxpayer's counsel gave the OPA officials a check for $2,065,842.02 and the court signed the judgment submitted to it by the agreement.

The Tax Court found multiple motivation for the taxpayer's agreement to settle. It said:

"For a number of reasons the petitioner [taxpayer] finally agreed to compromise the O.P.A. claims by paying $2,065,842.02. Government contracts were then being cancelled and petitioner had to expand its civilian production. As long as the controversy continued, petitioner was unable to quote prices and do business in a competitive market. Petitioner's financial position was seriously jeopardized because of the controversy. About $2,100,000 in uncollected accounts had accumulated after the petitioner had suspended billing on October 16, 1944. At the same time, petitioner had undertaken heavy obligations for a new plant and machinery. On September 18, 1944, petitioner's board of directors had authorized the expenditure of $5,000,000 for a new plant. By November 1944, petitioner had entered into commitments involving about $1,250,000 of the $5,000,000 to be spent. Petitioner was facing the renegotiation of large Government contracts which eventually entailed a repayment of about $1,700,000 before taxes. In view of these facts, petitioner's officers decided that litigation with O.P.A. should be avoided, if possible."

The Tax Court further found that Pacific Mills in calculating its ceiling prices had not failed "to take practicable precautions in applying the provisions of MPR 163," and that its "actions were in good faith and not the result of an unreasonable lack of care."

We agree with the Tax Court that the $2,065,842.02 paid in settlement of the overcharges alleged by OPA was properly deductible by the taxpayer in the year of payment as an ordinary and necessary business expense.

It goes without saying that the payment made in settlement of the claim for overcharges was incurred by the taxpayer during the taxable year involved in carrying on its trade or business. Thus the first question to arise under the literal reading of § 23(a) (1) (A) quoted in material part in footnote 1, supra, is whether that payment was an "ordinary and necessary" expense of the taxpayer's business within the commonly accepted meaning of those words in the market place. We think it was.

■■ An expense does not have to be absolutely essential in order to qualify as necessary. It is enough if an expense is incurred in consummating a transaction which is beneficial, that is, appropriate and helpful, to the taxpayer's business. The payment with which we are concerned clearly falls into this category. In any event, the payment was thought by the taxpayer's officers to be beneficial, and we should be slow indeed, even if we were inclined, which we are not, to question the soundness of their judg-

ment. Welch v. Helvering, 1933, 290 U. S. 111, 113, 54 S.Ct. 8, 78 L.Ed. 212.

 To qualify for deduction, however, an expense must not only be necessary but it must also be ordinary. This does not mean that the expense must be one usually or customarily or repeatedly incurred by the particular taxpayer involved. An expense is ordinary in the statutory sense if it is one of relatively common occurrence in the general type of business involved. Welch v. Helvering, supra, 290 U.S. at page 114, 54 S.Ct. 8; Deputy v. Du Pont, 1940, 308 U.S. 488, 495, 60 S.Ct. 363, 84 L.Ed. 416. We think that the payment made by the taxpayer in settlement of its dispute with OPA qualifies as an ordinary expense under the statute as interpreted in the above cases.

The attempt to control inflation during the period of world-wide war through the control of prices necessarily involved far-flung and detailed regulation of business. Unavoidably, specific regulations for the control of particular businesses had to be detailed and complicated, and in drafting such regulations in the haste engendered by the emergency, discrepancies, even contradictions, in the individual regulations themselves were inevitable. Indeed, the OPA officials who negotiated the settlement of the dispute with Pacific Mills conceded certain contradictions between MPR 163 and its accompanying Statement of Considerations and press release, and collateral to the settlement agreed to recommend amendments, which were later adopted, and incidentally sanctioned the interpretation originally put on the regulation by Pacific Mills. In this situation innocent violations of the numerous price regulations were not only by no means rare but were almost inevitable in business generally, and payments in consequence of such violations were necessarily of frequent occurrence in the conduct of most if not all trades and businesses. See Jerry Rossman Corp. v. Commissioner, 2 Cir., 1949, 175 F.2d 711, 714; National Brass Works v. Commissioner, 9 Cir., 1950, 182 F.2d 526, 529, 20 A.L.R.2d 590 and cases cited.

Thus the payment to OPA with which we are here concerned constituted not only an expense "directly connected with" but also one which "proximately resulted" Kornhauser v. United States, 1928, 276 U.S. 145, 153, 48 S.Ct. 219, 220, 72 L.Ed. 505, from doing business under war-time price controls. It was, therefore, both "ordinary" and "necessary" according to "the ways of conduct and the forms of speech prevailing in the business world". Welch v. Helvering, 1933, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212. See also Lilly v. Commissioner, 1952, 343 U.S. 90, 93–94, 72 S.Ct. 497, 96 L.Ed. 769.

But this conclusion does not finally dispose of the case. Although the purpose of taxing income is to raise revenue, not to reform men's moral characters, nevertheless the Bureau of Internal Revenue with judicial approval, Textile Mills Securities Corp. v. Commissioner, 1941, 314 U.S. 326, 335–339, 62 S.Ct. 272, 86 L.Ed. 249 and the federal courts independently, have repeatedly invoked public policy considerations nowhere specifically mentioned in the Code to justify disallowance of some ordinary and necessary business-incurred expenses. For review of such cases see Note, 51 Col.L.Rev. 752 (1951). Some circuit courts of appeals have indicated that the test of deductibility is whether the payment sought to be deducted was a "penalty" or whether it was not. We shall not use the term "penalty," however, because of its ambiguity, for, as the Court of Appeals for the Second Circuit pointed out in Jerry Rossman Corp. v. Commissioner, supra, 175 F.2d at page 713 "there are 'penalties' and 'penalties,' and * * * some are deductible and some are not", so that "in every case the question must be decided ad hoc." We think the true criterion for determining deductibility or non-deductibility was indicated by the Supreme Court of the United States in the leading case of Commissioner of Internal Revenue v. Heininger, 1942, 320 U.S. 467, 473, 64 S.Ct. 249, 253, 88 L.Ed. 171 wherein it is said:

"The Bureau of Internal Revenue, the Board of Tax Appeals, and the federal courts have from time to time, however, narrowed the generally accepted meaning of the language used in Section 23(a) in order that tax deduction consequences might not frustrate sharply defined national or state policies proscribing particular types of conduct. A review of the situations which have been held to belong in this category would serve no useful purpose for each case should depend upon its peculiar circumstances."

We shall, therefore, following the path indicated by the Supreme Court in the case last cited, proceed to consider whether allowance of the expense incurred by Pacific Mills in settlement of its dispute with OPA as a deduction from its excess profits tax "would frustrate the sharply defined policies", 320 U.S. 467, 474, 64 S. Ct. 249, 254, of the Emergency Price Control Act of 1942 as it stood after its amendment by the Stabilization Extension Act of 1944.

█ It is clearly evident from the wording of the amended statute itself, as well as from the legislative history of the amendatory act, that the fundamental policy of the act as amended was to draw a sharp line of distinction between innocent violators on the one hand, and those who had either violated the act wilfully, or else had failed to take practicable precautions to comply, on the other. To this end violators were subjected by § 205(e) of the amended act to payment of no more than their overcharges for the preceding year, or $25, whichever was greater, when they were able to prove that their violation was neither wilful nor the result of their failure to take practicable precautions against the occurrence of their violation. But violators who could not prove both their lack of wilfulness and that they had taken practicable precautions to comply were subjected in the court's discretion to the payment of up to three times the amount of their overcharges for the preceding year or else to not less than $25 nor more than $50, whichever sum should be the greater. Payment in either event was to be to the purchaser provided he sued within the time limited therefor in the act, unless he purchased the commodity involved for use or consumption in his trade or business, for in that event, presumably, the first buyer had passed the overcharge on to those who had in turn purchased from him and it would be inequitable for him to recover and impractical to find those who had actually suffered from the overcharge. But, to prevent a violator in either category from wholly escaping the consequences of his violation, the section provided for payment to the Administrator whenever a purchaser for any reason was not entitled to sue. From these provisions it seems clear that the policy of the statute was not to punish violators who could prove that their violation was neither wilful nor the result of failure to take practicable precautions, but only to make them give up the proceeds of their violation, either as restitution to the buyer or, to prevent the violator's unjust enrichment, to the Administrator. But, as to violators who were unable to prove that their violation was neither wilful nor the result of failure to take practicable precautions it was the policy of the statute to require payment not only of the amount of the recoverable overcharges, but up to three times that amount in the discretion of the court. Thus, assuming that to allow a violator who was unable to prove that his violation was neither wilful nor the result of his failure to take practicable precautions, (one whom we may call for convenience a culpable violator) to deduct a payment such as the one under consideration would indeed frustrate the clearly defined policy of the act, National Brass Works v. Commissioner, 9 Cir., 1953, 205 F.2d 104, the question arises as to whether Pacific Mills was such a violator or not, for if it was not, no statutory policy would be violated by permitting it to deduct its payment to the Administrator. Jerry Rossman Corp. v. Commissioner, 2 Cir., 1949, 175 F.2d 711; National Brass Works v. Commissioner, 9 Cir., 1950, 182 F.2d 526; Hershey Creamery

Co. v. United States, 1952, 101 F.Supp. 877, 122 Ct.Cl. 423.

The quality of its violation as culpable or blameless was never judicially determined in litigation between OPA and the taxpayer. The Tax Court in the instant litigation, however, found its violation to have been blameless. In addition to the findings already quoted that court said:

"After a careful consideration of all the evidence we have found that in the instant proceeding petitioner, in good faith and with the exercise of reasonable care, calculated its ceiling prices which it believed were in accordance with MPR 163. The overcharges which it made were not deliberately nor intentionally made."

And, in explanation of the payment by the taxpayer of a sum greater than its estimated overcharges for the year preceding the date when the suit was actually brought, the Tax Court said:

"The whole purpose of the payment to O.P.A. in the instant case was to settle a claim for an alleged violation of MPR 163 which petitioner believed it did not violate, but, that if it did violate, it did so without any wilful intent. While petitioner paid $2,065,842.02 to O.P.A. its liability for treble damages for the statutory one-year period might have been approximately $5,-400,000. Although the payment to O.P.A. exceeded the statutory one-year overcharges, the excess over this amount was not an arbitrary figure for the purpose of making the payment punitive, but rather the entire amount was carefully calculated to reflect the overcharges for the entire period from June 22, 1942 to the date of settlement in such a way as to remove petitioner's profit from past overcharges."

The Commissioner contends that the Tax Court was clearly wrong in failing to conclude on the undisputed and indis-putable evidence that the money paid by Pacific Mills in settlement of its disagreement with OPA was exacted by the latter with the deliberate purpose of making that payment punitive. Wherefore he says that to allow the taxpayer to deduct from its taxes the amount it paid to OPA would of necessity mitigate its punishment and hence frustrate the basic policy of the price control statute.

The Commissioner seeks to support his premise on several grounds. He says that in this case, where millions of dollars were involved, Pacific Mills must be charged with failure to take practicable precautions because it did not ask for an advisory ruling under Procedural Regulation 1.[2] We cannot agree. It is nowhere suggested that the taxpayer's interpretation of MPR 163 was unreasonable, and moreover its interpretation was accepted without challenge or even question in December 1942 when its calculation of ceiling prices was first reviewed by representatives of OPA. Under these circumstances we do not see how it can be said that practicable precautions were not taken because an advisory ruling was not requested unless we are willing to say that "practicable precautions" means every precaution, which would rob the phrase of its meaning, for either there would have to be resort to Procedural Regulation 1, in which event there would be no violation, or else there would automatically be a failure to take "practicable precautions."

Then the Commissioner asserts that the Tax Court erred in its ultimate conclusion because it did not "accord proper respect" to what he calls the "Administrator's judgment" that Pacific Mills had failed to take practicable precautions. The short answer to this contention is that the Administrator never passed judgment on the question of the precautions taken by the taxpayer to comply with the regulation. All that appears is that the local enforcement at-

2. OPA Procedural Regulation No. 1, § 1300.50, 7 Fed.Reg. 972 (1942); OPA Revised Procedural Regulation No. 1, §§ 1300.51, 1300.52, 7 Fed.Reg. 8961, 8965 (1942).

torney in the course of conferences leading up to settlement expressed his opinion that Pacific Mills had failed to take practicable precautions.[3] Certainly a tactical position taken by local counsel in settlement negotiations is not an administrative determination of any sort. It is at the most only an accusation by a subordinate official, and an accusation, even one made by the Administrator himself, when unsupported by evidence taken at a hearing at which the accused was at least given opportunity to appear is not even the slightest positive evidence of guilt under any rule of law of which we are aware.

Furthermore, and finally, the Commissioner vigorously contends that the demand by OPA, and the payment by Pacific Mills, of an amount in settlement greater by some $265,000 than the estimated actual overcharges (about $1,800,-000) for the year preceding suit clearly establishes that the entire sum paid in settlement was exacted for the purpose of punishing Pacific Mills and so cannot be deducted from its taxes without mitigating its punishment and thus frustrating the clearly defined policy of the Emergency Price Control Act of 1942 as amended by the Stabilization Extension Act of 1944. We have difficulty with the Commissioner's argument that because $265,000 of the settlement figure was exacted as punishment the entire sum paid in settlement must also have been exacted as punishment. We pass that difficulty, however, for the Commissioner's argument flies in the face of the clear finding of the Tax Court, which is supported by ample documentary and oral evidence in the record, that the excess of the amount paid in settlement over the estimated amount of the actual overcharges for the preceding year was not fixed at "an arbitrary figure for the purpose of making the payment punitive, but rather the entire amount was care-

fully calculated to reflect the overcharges for the entire period from June 22, 1942 to the date of settlement in such a way as to remove petitioner's profit from past overcharges." The amount by which the settlement exceeded the overcharges for the year preceding did not cease to be profit because the statute of limitations barred its recovery. The amount remained profit for alleged overcharges which Pacific Mills for its own good reasons agreed to forego. We do not see why its agreement to forego that profit should operate through the tax statute to impose a far heavier penalty upon it than the one OPA was content to impose, even if we assume with the Commissioner, and contrary to the finding of the Tax Court, that some $265,000 of the amount paid in settlement was indeed exacted as a penalty.

The decision of the Tax Court is affirmed.

---

3. The Commissioner argues that the agreement of taxpayer's representative, after this accusation was made, to "go along with a settlement" on the basis of paying more than the overcharges for the preceding year constituted an admission of Pacific Mills' failure to take practicable precautions. This argument seems to us to rest upon a clear misinterpretation of the Tax Court's finding. Furthermore, there is no support for the argument in the evidence.