JESSE E. HALL, SR., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 62186, 62187, 62188. Filed May 29, 1959.

---

[1] The following proceedings are consolidated herewith: Rhoda O. Hall, Docket No. 62187; and Jesse E. Hall, Sr., and Rhoda O. Hall, Docket No. 62188.

*Donald P. Moyers, Esq.*, and *John H. Conway, Jr., Esq.*, for the petitioners.

*Carswell H. Cobb, Esq.*, for the respondent.

398

402

404

OPINION.

BLACK, *Judge:* The questions involved herein are: (1) Whether petitioner is entitled to a deduction of $316,784.38 as an ordinary and necessary business expense incurred in 1947, and (2) whether the Commissioner properly allocated to petitioner under section 45 the amounts of $278,124.96 and $768,779.56 for the years 1947 and 1948, respectively. There is also a question of fraud but that will be discussed last.

The facts relating to the first two questions are somewhat similar and will be set out to the extent necessary to an understanding of the issues. Hall, who spent most of his life connected with the water and oil well drilling industry, developed and manufactured certain equipment, viz, spiral centralizers and scratchers, designed to facilitate the cementing of oil wells. In 1946, after a few years of slowly but steadily increasing sales, he was able to prove the worth of his products and methods to Gulf by successfully cementing a number of difficult wells in Louisiana. In that year his sales of about $230,000 more than doubled his 1945 sales. In 1947, Gulf invited him to Venezuela to try his products there. Again his products and methods were successful on some difficult wells. Mene Grande, Gulf's subsidiary in Venezuela, placed orders for his equipment amounting to over $500,000.

Although not required to do so by the terms of his sales, Hall offered free service to purchasers. He sent instructions regarding the proper use of the equipment along with all orders, but he recommended having one of his men present the first few times the equipment was used. His equipment and methods were not generally accepted so it was advantageous and sometimes necessary to have his men instruct in its proper usage.

Faced with large Venezuelan orders, Hall had to return to the United States. However, to have a service and sales representative in Venezuela, he induced his son Elmer to leave his job with an oil company in April 1947 to come to Venezuela to take over.

Hall and Elmer considered setting up a permanent organization in Venezuela but delayed any action. In June 1947, serious cementing troubles brought Hall back to Venezuela. At that time he decided to form a Venezuelan corporation and also to secure help for Elmer. Berry, an experienced driller, who had just resigned his position with Shell Oil Co. in Venezuela, was contacted and offered a job. Berry was interested in Hall's products but wanted to go into business on his own. After negotiations, Spring Co., a Venezuelan corporation, was formed with Elmer as president and Berry as vice president. Hall contributed the original capital of about $8,000 and 248 of the 250 shares were transferred from the original incorporators to him. Elmer and Berry each had 1 share in his name. The 248 shares thus transferred to Hall remained in his name until February 16, 1948. Thereafter, 247 shares remained in Hall's name until August 16, 1948.

An agreement was entered into providing that Spring Co. would handle all foreign sales of Hall and that Hall would sell his products to Spring Co. at "cost plus 10%." However, "cost plus 10%" under Hall's computation was less than 10 per cent of Hall's list price. On the other hand, Hall usually only gave a maximum of 20 per cent of list price for other parties who did selling and servicing for him.

On all foreign sales made by Hall prior to August 7, 1947, Hall made a calculation that he owed Spring Co. the sales price less "cost plus 10%" on the theory that this was a reimbursement to Spring Co. for servicing this equipment. All unfilled foreign orders at August 7, 1947, and all foreign orders after that date were treated as handled by Spring Co. After the so-called "cutoff" date, Hall charged Spring Co. "cost plus 10%" and Spring Co. charged the ultimate purchaser at Hall's regular list price.

The first item in question is the amount which Hall determined that he owed Spring Co. as selling and servicing expense for all foreign sales made by him prior to August 7, 1947. This amounted to $316,784.38 and Hall deducted this amount as an ordinary and necessary business expense in 1947. The Commissioner has disallowed it in its entirety. He stated the reasons for this disallowance in his deficiency notice. Regarding this item, we agree with the respondent that it does not represent an ordinary and necessary business expense incurred in 1947 except in small part as hereinafter set out. Although the petitioner argues that a liability in this amount was incurred as a result of an arm's-length transaction with an unrelated party, the record shows that this was a transaction between related parties and, therefore, must be closely scrutinized (see issue 2, *infra*). And under close scrutiny it is evident that the claimed deduction does not meet the requirements of section 23(a)(1)(A).

Although Spring Co. and Hall had a written agreement regarding their relationship, this item, which is substantial in amount, is not mentioned. Although the amount was recorded on Hall's books the amount was nowhere mentioned in any of Spring Co.'s records. We are not even convinced that either Elmer or Berry understood what this amount represented in 1947.

The total foreign sales from January 1, 1947, to August 7, 1947, of $342,302.79 had already been made by Hall; therefore, no portion of this amount can be considered a selling expense. About $42,000 of these sales was made to purchasers in which Spring Co. did not have any personnel or servicing facilities. Of the remaining sales of about $300,000 to purchasers in Venezuela, the record indicates a substantial portion of the equipment thus sold had already been delivered and used prior to August 7, 1947, and, therefore, did not need any servicing.

Under these circumstances and other circumstances shown in the record, the $316,784.38 which, in our opinion is clearly unreasonable in amount, represented neither an ordinary nor a necessary business expense accrual in 1947, except as to a comparatively small part thereof. It does appear that some portion of this amount should be allowed as a deduction to cover the cost of servicing some of the equipment which would require servicing in Venezuela. This amount should be based on the amount of equipment sold in Venezuela prior to August 7, 1947, which was still unused at that time. Since we do not know with exactness the amount of unused equipment at that time, we have used our best judgment and have made an estimate. After a careful consideration of the evidence, we have computed the proper accrual which petitioner should be allowed for servicing the unused equipment, as follows:

Total foreign sales to August 7, 1947_____ $342,000
Less sales in countries other than Venezuela_____ 42,000

Sales in Venezuela_____ 300,000
Estimated amount used prior to August 7_____ 150,000

Equipment unused at August 7_____ 150,000

15 per cent thereof for servicing_____ 22,500

The amount of $22,500 represents an ordinary and necessary business expense incurred in Hall's business during 1947. Cf. *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930). Accordingly, that amount is deductible in 1947 in lieu of the claimed amount of $316,784.38.

Regarding the second issue, i.e., the sales after August 7, 1947, the Commissioner determined that the full list price on all items sold by Weatherford Co. to Spring Co., less 20 per cent for selling and

servicing, should be treated as Hall's income. From this amount the Commissioner deducted the amount reported by Hall on these sales, i.e., cost plus 10 per cent. The question here is whether the Commissioner acted properly under section 45 which provides:

SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The petitioner argues that his sole proprietorship, Weatherford Co. and Spring Co. were not owned or controlled directly or indirectly by the same interests, i.e., Hall argues that he had no interest in Spring Co. and that it was an altogether independent business corporation.

On the question of ownership practically all of Spring Co.'s shares were held in Hall's name from the time it was organized in July 1947 until August 1948, when the shares were transferred to his son Elmer's name. Petitioner argues that despite the record ownership the shares of Spring Co. were at all times relevant owned by Berry and Elmer equally, and that this division of ownership was the result of arm's-length negotiations involving Hall, Elmer, and Berry immediately prior to the formation of Spring Co.

We do not doubt that Berry had some interest in Spring Co. in addition to a straight salary arrangement but on the record here we have been unable to find that Berry owned one-half of the Spring Co. stock. In addition to the record ownership of the stock Hall contributed the entire paid-in capital of Spring Co. The so-called agreement purportedly giving Berry one-half of the Spring Co. stock was not embodied in writing despite the "arm's-length" negotiations preceding it and despite the fact that the contract between Hall and Spring Co. was in writing. Considering all the evidence in the record, we have been unable to find that during the taxable years the stock of Spring Co. was owned one-half by Elmer and one-half by Berry. However, regardless of the question of the ownership of the Spring Co. stock, we think the record is abundantly clear that Hall controlled Spring Co. during the taxable years. Section 29.45–1 of Regulations 111 provides:

SEC. 29.45–1. DETERMINATION OF THE TAXABLE NET INCOME OF A CONTROLLED TAXPAYER.—(a) Definitions.— * * *

\*          \*          \*          \*          \*          \*          \*

(3) The term "controlled" includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the

reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

In this case it seems to us that the evidence shows that gross income has been arbitrarily shifted from Hall personally to Spring Co. Hall usually paid a 20 per cent commission to unrelated third parties for both selling and servicing. Cf. *Asiatic Petroleum Co. (Delaware) Ltd.*, 31 B.T.A. 1152 (1935), affd. (C.A. 2, 1935) 79 F. 2d 234, certiorari denied 296 U.S. 645 (1935). The "cost plus 10%" contract with Spring Co. resulted in effect in a commission of over 90 per cent to Spring Co. for both selling and servicing. Furthermore, Spring Co. did not have selling or servicing facilities in any foreign countries except Venezuela. The fact that George, one of Hall's sons, went to Kuwait in 1948 to service equipment only shows that Hall regarded the whole operation as his because George worked for Hall rather than Spring Co.

In addition to the arbitrary shifting of income, the record is replete with instances of Hall's completely controlling and dominating Spring Co. The cash in the bank account of Spring Co. in Weatherford, Texas, in which most of the proceeds of Spring Co.'s sales were deposited, was available and was used by Hall. Berry was not even authorized to draw on the account and all checks had to be authorized by Hall. The many letters in the record that passed between the parties during the time in question clearly indicate to us that Hall was in complete control of Spring Co.

We think it clear from all the facts and circumstances that Hall owned or controlled directly or indirectly Spring Co. within the meaning of section 45. And the Commissioner, who has considerable discretion under that section, see *National Securities Corp.* v. *Commissioner*, 137 F. 2d 600, affirming 46 B.T.A. 562, certiorari denied 320 U.S. 794, acted properly so as to clearly reflect the income of Hall and Spring Co. Indeed, the record indicates that the allocation reflects Hall's income as if he had been dealing with unrelated third parties. That, of course, is the purpose of the statute. Cf. *Asiatic Petroleum Co. (Delaware) Ltd.*, *supra*. Accordingly, we uphold the determination of the Commissioner under section 45 for the years 1947 and 1948.

The final question is whether any part of the deficiencies is due to fraud with intent to evade tax. On this issue the burden of proof is upon the Commissioner, section 1112. Respondent has not introduced any direct evidence showing a fraudulent intent. Fraud, however, is rarely proved by direct evidence. It is usually inferred from circumstances. But, as has been held in many cases including some of the Supreme Court, the circumstances upon which a finding of fraud can be based must be both clear and convincing.

Here, the circumstantial evidence upon which the Commissioner relies, in our judgment, neither clearly nor convincingly indicates fraud. Clearly nothing fraudulent can be inferred from the formation of the Spring Co. in Venezuela; it is not unusual for an American company to have a foreign entity handle foreign business. For example, in the instant case we have the fact brought to our attention that Gulf, a well-known United States corporation, operated in Venezuela through a subsidiary, Mene Grande Oil Company. And although the contract between Hall and Spring Co. was not at arm's length, as we have endeavored to point out, and did not result in a clear reflection of income, there is no indication that Hall was willfully attempting to evade, rather than avoid, taxes. On the contrary, the record convinces us that he reported what he thought was legally due. The fact that it turns out that we have held that the Commissioner has properly applied section 45 in the instant case does not mean that we think the Commissioner has established fraud. As already stated, we think he has not done so. Accordingly, we think that no part of Hall's deficiency was due to fraud with intent to evade tax and we have so found. The Commissioner's addition to tax under section 293(b) is not sustained.

*Decision will be entered under Rule 50.*