CENTRAL IGUALDAD, INC., Plaintiff and Appellee, *v.* SECRETARY OF THE TREASURY OF PUERTO RICO, Respondent and Appellant.

No. 11971. Resubmitted May 12, 1961.—Decided June 20, 1961.

*José Trías Monge, Secretary of Justice* and *José A. García Malpica, Assistant Attorney General,* for appellant. *Juan A. Faría* for appellee.

Mr. Justice Blanco Lugo delivered the opinion of the Court.

During the taxable years involved in the present suit, Central Igualdad, Inc. was a closed corporation whose capital stock was divided among the members of three well-known families of the west of Puerto Rico, joined by bonds of consanguinity and affinity.[1] On August 4, 1931 the Board of

---

[1] The capital stock during the years 1943 to 1945 was represented by 13,000 shares of stock distributed as follows:

| Stockholder | Shares | Proportion |
|---|---|---|
| Alfredo Ramírez de Arellano | 8, 580 | 66. 00% |
| Josefa Bartoli de Ramírez | 39 | 0. 30% |
| Emilia Piñán widow of Fajardo | 2, 431 | 18. 70% |
| Raquel Fajardo de Ross | 806 | 6. 20% |
| Miguel A. García Méndez | 1, 131 | 8. 70% |
| Alfredo Ramírez de Arellano, Jr. | 13 | 0. 10% |

The above-mentioned stockholders had the same proportion of the capital stock in 1942, even when the issued stock was only 9,000. Ap-

Directors of said corporation agreed to grant a bonus of fifty cents for each ton of superior cane delivered during the months of December, January, February, May, and June of the crop season by colonos Alfredo Ramírez de Arellano, Luis A. Fajardo, Alfonso Valdés, Miguel A. García Méndez, and Ubaldino Ramírez de Arellano. This agreement, according to the Board of Directors, came as a result of (1) the need and benefit of grinding cane of rich components during the months from December to February; and (2) the need of guaranteeing uninterrupted grinding during the months of May and June "to avoid losses for the factory." A condition was stipulated that the cane "should have a minimum of 13 sucrose and 80 of purity."[2]

This agreement was amended at the meeting held on December 6, 1932, and the bonus was specifically confined to cane delivered by *"the directors of this corporation"* planted and cultivated on farms belonging to *"said directors."* Besides, the President of the corporation was empowered, if it was convenient to the interests of the mill, to execute any other contract with the *"Directors of this institution"* to grant them a "special bonus according to the delivery of the cane" provided it was not greater than that granted to *"the Directors* who plant and grow said cane on their own land."

---

parently, in 1943 new capital was contributed or a stock dividend was declared. In 1946 Ramírez de Arellano distributed a substantial part of his stock among his children.

[2] Subsequently, the Board of Directors, in referring to this agreement at the meeting held on December 6, 1932, stated the following in the corresponding minutes:

"It is entered in the minute as a decision of this Board to credit a bonus of fifty (50) cents to those Directors of this Corporation who deliver cane of rich components of the type known as 'Rayada,' 'Santa Cruz,' 'B and C 10/12,' 'P.O.J. 27/25' and any other known superior cane containing rich components, to be ground during the months of January and February, and likewise to credit them with a fifty (50) cent bonus for all those delivered during the months of May and June. It is intended as an incentive for the delivery of cane during such periods in order to maintain the grinding quota."

By reason of the death of stockholder and Director Luis A. Fajardo, an agreement was reached on August 19, 1941, which reads in part as follows: "Mr. García Méndez proposes that since ex-Vice-President Luis A. Fajardo has had the *privilege of the bonuses* awarded to officers of this company, the cane of Raquel Fajardo Ross (daughter of the deceased) be considered as having the same right to the above-mentioned bonus during the months involved in this concession, since they are a part of the same cane that Mr. Fajardo, an officer, formerly had." It was not necessary to make the same agreement as to the cane of Emilia Piñán, widow of Luis A. Fajardo, because she had been appointed Vice-President to replace her deceased husband, and as such directress she was covered by the provisions of the general agreements of 1931 and 1932, to which we have referred.

Pursuant to the above-mentioned agreements the corporation paid out bonuses during the years 1942 to 1946,[3] as itemized below, which it claimed thereafter in its income tax return as an "ordinary and necessary" expense for the operation of its business.

| | | | |
|------|-------------|------|-------------|
| 1942 | $27,815.53 | 1945 | $19,069.77 |
| 1943 | 19,045.31 | 1946 | 20,705.51 |
| 1944 | 4,277.85 | | |

The beneficiaries of the bonuses during those years were Alfredo Ramírez de Arellano, Miguel A. García Méndez, Alfredo Ramírez de Arellano, Jr., Emilia Piñán widow of Fajardo, Mr. and Mrs. A. J. Ross, and Raquel Fajardo Ross, J. A. B. Nolla, Frank Phillippi and certain agricultural enterprises known as Comunidad Sabanetas, Comunidad Ibern, Comunidad Altagracia, and Finca Hau. These agricultural enterprises were partnerships constituted by the same direc-

---

[3] Despite the fact that the agreements allowed a credit of fifty cents for each ton of cane delivered, it was computed only on the basis of twenty-five cents for each ton. The bonus for the year 1944 amounting to $4,277.85 was paid in 1945.

tors and stockholders of Central Igualdad, Inc., who leased certain parcels of land and used them to plant and grow sugar cane.

The Superior Court, San Juan Part, upheld the position assumed by the taxpayer corporation to the effect that these bonuses were deductible as ordinary and necessary expenses of the business, since this plan had no other purpose "than to insure the economic stability and proper functioning of its sugar mill." Among other things said court stated:

"Central Igualdad, operated by plaintiff corporation, was founded in 1925. Due to its limited capacity for production and to the low prices for sugar prevailing in 1932, the business was declining. The Board of Directors considered that the best way to eliminate the losses sustained in former years and to convert them into profits in subsequent years, was to increase the volume of cane to be ground in each crop season in order to reduce thereby the processing cost per hundredweight of sugar when reducing their fixed expenses, without having to increase the daily capacity of grinding, since it was necessary for this purpose to make a considerable investment in the enlargement of the mill and in other manufacturing facilities which plaintiff was not in a condition to meet at the time, because during the years immediately preceding the profits of the business had been meager and the price of the sugar was then very low. These circumstances did not justify said investment, aside from the fact that it was difficult to obtain financial aid from banking institutions for such purpose.

"In order to implement the above-mentioned solution to the problem, plaintiff decided that the practical thing to do was to extend its crop season, starting in December and prolonging it until July, even when it meant grinding cane during the low yield months. The members of the Board of Directors consulted the colonos and discovered that the latter preferred to grind during the high yield months, which are, according to the evidence presented, those included between the middle of February until the middle of May. Considering the attitude of the colonos, the Directors then agreed to grind in their own mills as much cane of their individual plantations as was necessary to complete the normal grinding quota of the mill during the low yield

months, that is, from December until the middle of February, and from the middle of May until the end of the crop season in June or July, on the basis that the mill would pay them a compensation or bonus of 25¢ for each ton of ground cane which would give a total yield less than the minimum stipulated between them and plaintiff. This plan was consistently carried on during the subsequent years with slight changes, such as increase in the bonus to be paid for each ton of cane thus ground and extending the plan to all those stockholding colonos, even if they were not directors, as well as to all those individual colonos who were willing to bind themselves to deliver sufficient cane in order to complete the above-mentioned normal grinding quota during the low yield months.

" . . . . . . .

"The evidence further shows that these payments have not been privilege payments granted to the stockholding colonos whether they be directors or not, as has been the position assumed by respondent from the commencement of the evidence of this case, since the evidence reveals that plaintiff was willing to grant an equal bonus to the colonos as well as to stockholders, and they preferred to grind their cane only during the high yield months, waiving said bonus."

Section 32(a)(1) of the Income Tax Act of 1924 (13 L.P.R.A. § 735(a)(1)), allows a corporation, in computing its net income, to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Of course, there is no infallible formula to determine when an expense shall be considered as ordinary and necessary. *Welch* v. *Helvering*, 290 U.S. 111, 115 (1933); *What expenses are "ordinary and necessary" within meaning of income tax laws permitting deduction of ordinary and necessary business expenses*, 84 L. Ed. 426 (1940). Regarding this problem it is necessary to bear in mind two basic rules: (1) that since deductions are a matter of legislative grace, they should be restrictively construed. *Clínica Juliá* v. *Secretary of the Treasury*, 76 P.R.R. 476 (1954); *Treasurer of Puerto Rico* v. *Tax Court*, 73 P.R.R. 450 (1952); *Buscaglia, Treas.* v. *Tax Court*, 67

P.R.R. 548 (1947), affirmed in 168 F.2d 401 (1948) ; *Fifth Ave. Coach Lines, Inc.* v. *Commissioner*, 281 F.2d 556 (C.A. 2, 1960) ; *Long* v. *Commissioner*, 277 F.2d 239 (C.A. 8, 1960) ; *Northern Natural Gas Co.* v. *O'Malley*, 277 F.2d 128 (C.A. 8, 1960) ; see, Griswold, *An Argument Against the Doctrine That Deductions Should be Narrowly Construed as a Matter of Legislative Grace*, 56 Harv. L. Rev. 1142; (2) that it is up to the taxpayer to establish his right to the deduction claimed. *Radom & Neidorff, Inc.* v. *United States*, 281 F.2d 461 (Ct. Cl. 1960). Three conditions should be complied with in order that this deduction may be allowed: (*a*) that the expense be incurred during the course of a business; (*b*) that it constitute an ordinary and necessary expense, and (*c*) that it be paid or incurred during the taxable year. 4 Mertens, Law of Federal Income Taxation, § 25.07.

The requisites that the expense be ordinary and necessary must coexist. Mertens, *op. cit.*, § 25.09. An expense shall be considered as necessary where it is helpful in the development and promotion of the business, *Amtorg Trading Corp.* v. *Commissioner*, 65 F. 2d 583 (C.C.A. 2, 1933), commented in a note in 47 Harv. L. Rev. 1209, 1264 (1934), but it does not imply that it must be indispensable, but that it is sufficient that there be a reasonable connection with the purpose of promoting the business. *Commissioner* v. *Pacific Mills*, 207 F.2d 177 (C.A. 1, 1953) ; *Schomburg* v. *Treasurer*, 6 *D.T.C.* 24 (1949). It is an ordinary expense when it occurs generally in the regular course of the business, *Lilly* v. *Commissioner*, 343 U.S. 90 (1952) ; *Deputy* v. *Du Pont*, 308 U.S. 488 (1940) ; *Bing* v. *Helvering*, 76 F.2d 941 (C.C.A. 2, 1935) ; *cf. Schomburg* v. *Treasurer, supra.* Another factor to be considered is the relation between the person or entity which incurs in the expense and that which receives payment. *Jesse E. Hall, Sr.* v. *Commissioner*, 32 T.C. 390 (1959) ; *cf. Clínica Juliá* v. *Secretary of the Treasury*, 76 P.R.R. 476, 497 (1954). Each case should be decided in the light of its own

particular facts. It has been thus done by this Court on several occasions[4] as well as by the former Tax Court.[5]

 Appellee taxpayer has presented this appeal to us as the typical example of a case involving a simple conflict in the evidence which was solved in its favor. Patiently it has pointed out to us certain pages of the transcript of the evidence which apparently support the findings of the trial judge. But actually, the matter is not that simple. As a matter of fact, the main testimony of the witnesses is contained in various pieces of documentary evidence admitted during the course of the hearing. Their statements were rather directed towards explaining the contents of this documentary evidence. The rest of their testimony did not shed much light on the fundamental problem involved, that is, on the deductibility, as an ordinary and necessary expense, of the bonuses granted to stockholding colonos. We have repeatedly held that as far as the weighing of documentary evidence is concerned we hold the same position as the trial court and we have flatly refused to extend to them the shield of immunity which we generally bestow on findings based on oral evidence. *Castro* v. *Meléndez*, 82 P.R.R. 556 (1961) ; *Feliciano* v. *Sundem*, 78 P.R.R. 1, 6 (1955) ; *Luce & Co.* v. *Cianchini*, 76 P.R.R. 155, 159 (1954) ; Rule 43.1 of the Rules of Civil Procedure of 1958; *cf. Sanabria* v. *Heirs of González*, 82 P.R.R. 851 (1961).

We have studied the evidence presented very carefully and, in our opinion, it establishes several facts of special significance which prompt us to decide the case against the taxpayer corporation. There is not the slightest doubt that

---

[4] *Buscaglia, Treas.* v. *Tax Court*, 68 P.R.R. 839 (1948) ; *Treasurer of Puerto Rico* v. *Tax Court*, 73 P.R.R. 450 (1952) ; *Valdés* v. *Tax Court*, 71 P.R.R. 670 (1950) ; *Sucn. Pedro Giusti* v. *Tax Court*, 70 P.R.R. 109 (1950).

[5] *Schomburg* v. *Treasurer*, 6 *D.T.C.* 24 (1949) ; *Corporación Saurí & Subirá* v. *Treasurer*, 5 *D.T.C.* 873 (1947) ; *Santiago* v. *Treasurer*, 5 *D.T.C.*, Supp. 11 (1948) ; *Antonio Roig Sucrs. S. en C.* v. *Treasurer*, 4 *D.T.C.* 919 (1946) ; *South Porto Rico Sugar Co.* v. *Treasurer*, 3 *D.T.C.* 575 (1946) ; *Yabucoa Sugar Co.* v. *Treasurer*, 2 *D.T.C.* 257 (1945).

the agreed bonus was granted solely to the directing colonos or to persons so intimately related to the latter that for all practical purposes it is as though they were the same persons. Plaintiff failed to establish that the same arrangement was offered to private colonos who delivered cane during inadequate months. In this regard it is significant that the testimony—so easily available—was not produced as to any one of the particular colonos in order to corroborate the naive allegation that a bonus of twenty-five cents per ton of cane was rejected by them, although they were qualified to obtain said profit.[6] On the other hand, the text of the original agreement and subsequent amendments, clearly prove that it was meant to benefit only those colonos related to the business. So much so, that when one of the main stockholders and directors died, it became necessary to amend the agreement in order to make it extensive to one of his heirs, who did not belong to the board of directors. We also noted that, in view of the fact that various individual colonos were creditors to the bonus on the basis of the factor originally considered, it was sought to insert as an additional condition for qualification to recover the bonus, another factor which was not expressly stated in the agreement appearing in the minutes, which is, that the colono should begin and should finish the grinding with the mill, that is, that he shall deliver cane during the entire period of the crop season. It is very hard to comply with this additional requisite, unless it involves colonos who grind considerable tonnage. However, the evi-

---

[6] It was sought to establish that colonos Carlos Padovani and Domingo Bonet Santos received the above-mentioned bonus, but the final result of the evidence presented was that the payments were certain items considered as bonuses for accounting purposes, and that they actually referred to differences in the liquidations of the cane delivered or to a special compensation for the delivery of the cane at the mill. None of the cases came specifically under the application of the agreements of 1931 and 1932, but rather under private contractual relations between the mill and these colonos. Besides, Exhibit 2 of plaintiff itself shows that the amounts paid for this bonus, which are claimed as a deduction, were paid exclusively to the colonos enumerated therein.

dence shows that several individual colonos also qualified in this respect.[7] It should also be borne in mind that the limitations in production of more than ninety per cent of the individual colonos[8] immediately excluded them from qualifying to obtain the bonus on the basis of the compliance with the two factors adduced, that is, delivery of the cane during the inadequate months and during the entire grinding season.

The evidence shows that, although it is true that individual colonos delivered a larger proportion of tons during the adequate months of March and April, than the relation between the total tonnage ground by the mill, the difference is not such as to justify the distribution of the bonus claimed as an ordinary and necessary expense. (See, Tables 1 to 4 of the appendix of this opinion.) The evidence precisely reveals that the colonos who were directors delivered practically the same tonnage which they would have delivered under a system of ideal proportional delivery as outlined by one of the directors.

As revealed by witness Juan J. Gómez, whose testimony regarding this matter was not contradicted in any manner whatsoever, except for the year 1945, the plan for delivery which Central Igualdad enforced gave a higher yield in hundredweights of sugar produced than the system of propor-

---

[7] From Exhibit H of defendant it appears that the following colonos delivered cane during the entire grinding period: 1942: Carlos Padovani, Juan Alemany Sosa, Doroteo Esteves, José Ramírez Rivera, and Alfonso Lugo Rodríguez; 1943: Pedro Rullán Rullán; 1944: Ana María Sugar Co., Juan Alemany Sosa, Domingo Bonet, Antonio Santos, and José Ramírez Rivera; 1945: Ana María Sugar Co., Juan Alemany Sosa, Carlos Padovani, Juan Esteves Gómez, Picó Hermanos, Domingo Bonet, Alfonso Lugo Rodríguez, Evangelista González, Pedro Rullán Rullán, and José Ramírez Rivera; 1946: Carlos Padovani.

[8] According to the testimony of one of the witnesses presented by the taxpayer, the production of the individual colonos was approximately as follows:

| | | | |
|---|---|---|---|
| 1 to 50 tons | 40% | 200 to 500 tons | 10% |
| 50 to 100 tons | 20% | 500 to 1,000 tons | 4% |
| 100 to 200 tons | 20% | More than 1,000 tons | 6% |

tional delivery.[9] (See, Table No. 5 of the appendix of this opinion.)

Finally, it seems odd that the net result of the bonus paid to the colonos listed was that the latter obtained a higher average income per hundredweight of sugar produced than the individual colonos, apparently favored because they ground most of their crop during the months of March and April. (See, Table No. 6 of the appendix of this opinion.)

The evidence of plaintiff corporation did not establish either that this practice of awarding bonus is followed by other enterprises under similar circumstances. It is well-known that in the majority of the sugar mills of Puerto Rico, if not in all of them, the grinding period extends for not less than five months. It seems inevitable to conclude that these bonuses are nothing more than privilege payments to colonos who are directors and stockholders, and which as such, do not constitute ordinary and necessary expenses of the business but rather a means of distributing profits.[10] It is evident that if they are accepted as ordinary and necessary expenses, it would reduce the net income of the corporation, and therefore, its tax liability. As to the beneficiaries, the situation does not change whether it is considered as a distribution or as a bonus, because in both cases it forms part of its gross income.

[9] Plaintiff's evidence tended to show that the bonus granted to colonos listed constituted an incentive for the latter to send their cane during inadequate months, that is, the months of lower yield, since the individual colonos insisted in grinding during March and April. Due to the fact that the mill could not, because of limitations in its grinding capacity, dispose of all the cane during these two months, it was necessary to commence the grinding in December or January and end the same in May or June. In order to avoid this "prejudice" to the colonos who delivered their cane during the entire crop season, the only other alternative would have been the system of proportional delivery.

[10] Precisely, when this controversy had not been foreseen, these payments were characterized as "privilege of bonuses." (See minutes of August 19, 1941.) The explanation which one of the directors offered regarding this fact is far from satisfactory.

In order to maintain that it is not a privilege payment or a distribution of dividends, appellant states that "there is no proportional identity whatsoever between the percentage of stock owned by each one of the stockholding colonos and the total stock issued by plaintiff and the percentage of that paid as bonus to each stockholder and the total amount paid on that account." However, the lack of this mathematical proportion is not controlling, since a distribution may be considered as a dividend even if no dividend has been formally declared by the board of directors, or the disbursement is not made proportionate to the holdings of each stockholder in the capital stock, and even when there are stockholders who do not participate in the distribution. *Jaeger Motor Car Co.* v. *Commissioner*, 284 F.2d 127, 134 (C.A. 7, 1960); *Simon* v. *Commissioner*, 248 F.2d 869, 875 (C.A. 8, 1957); *Lengsfield* v. *Commissioner*, 241 F.2d 508, 511 (C.A. 5, 1957); *Paramount-Richards Theatres, Inc.* v. *Commissioner*, 153 F.2d 602, 604 (C.A. 5, 1946); *Disguised Dividends: A Comprehensive Survey*, 3 U.C.L.A.L. Rev. 207 (1956). Payments of royalties to stockholders may constitute dividends or distribution of bonuses in order to enable corporate activities to continue, *Paramount-Richards Theatres, Inc.* v. *Commissioner, supra; Ingle Coal Corporation* v. *Commissioner*, 174 F.2d 569 (C.A. 7, 1949).

In *Cleveland Shopping News Co.* v. *Routzahn*, 89 F.2d 902 (C.C.A. 6, 1937), a corporation engaged in the business of advertising distributed among its stockholders part of the funds accumulated during two years. The distribution was made in proportion to the contributions made by stockholders into the funds during said period, regardless of the amount of stocks owned. Taxpayer's contention that the distributions were rebates given as an inducement to obtain advertisers was rejected, and the court stated that it was appropriate to construe said payments as dividends or distributions of profits. "They were not, it is true, distributed

in proportion to stock holdings, but all of the distributees were stockholders and all agreed that the distributions should be made among them in proportion to their contributions to the fund." See, *Associated Grocers of Alabama* v. *Willingham*, 77 F. Supp. 990 (Ala. 1948); *Peoples Gin Co., Inc.* v. *Commissioner*, 118 F.2d 72 (C.C.A. 5, 1941); *Juneau Dairies, Inc.* v. *Commissioner*, 44 B.T.A. 759 (1941). The case at bar deals with the distribution based on the amount of tons of cane delivered.

Even though there are cases wherein payments or bonuses to stockholders only may be considered as ordinary and necessary expenses, the concurring circumstances herein and which we have set forth lead us to decide that it is a question of distribution of profits.

In view of the foregoing, the judgment rendered by the Superior Court, San Juan Part, on December 16, 1952, is reversed.

Mr. Justice Santana Becerra did not participate herein.

# APPENDIX

TABLE No. 1 — Showing the Tons of Cane Ground at the Central Igualdad, Inc., During the Years 1942 to 1946 by Stockholding Colonos, Individual Colonos, and the Central

| Year | Total Grinding | Stock-holding Colonos | Proportion | Central | Proportion | Individual Colonos | Proportion |
|---|---|---|---|---|---|---|---|
| | | | Per Cent | | Per Cent | | Per Cent |
| 1942... | 356,251 22 | 225,419 79 | 63 27 | 7,124.96 | 2 00 | 123,706 77 | 34.73 |
| 1943.. | 316,451 | 180,291 | 56.97 | 4,430 | 1.40 | 131,730 | 41.63 |
| 1944... | 209,830 | 12',239 1 | 61.46 | 3,557.8 | 1.70 | 76,891.6 | 36.84 |
| 1945... | 305,657 | 171,836 | 56.22 | 2,869 | 0.96 | 130,932 | 42.82 |
| 1946... | 332,315 | 194,584 | 58 55 | 2,471 | 0.74 | 135,260 | 40.71 |

TABLE No. 2 — Showing the Tons of Cane Ground During the Months of March and April During the Years 1942 to 1946 by Stockholding Colonos and Individual Colonos

| Year | Total of Cane Delivered | Stockholding Colonos | Proportion | Individual Colonos | Proportion |
|------|------------------------|---------------------|------------|-------------------|------------|
| | | | Per Cent | | Per Cent |
| 1942................. ............. | 122,631.88 | 65,306.41 | 53.56 | 57,325.47 | 46.435 |
| 1943........................ | 124,929.69 | 66,302.725 | 53.30 | 58,626.965 | 46.70 |
| 1944..... .......... ....... | 107,612.432 | 64,554 44 | 60 43 | 43,057.995 | 39.57 |
| 1945......... ....... ..... . | 85,783.325 | 44,906 96 | 52.97 | 40,876.365 | 47.03 |
| 1 946.................. ..... | 126,418.39 | 64,276 145 | 51 05 | 62,142 245 | 48.95 |

TABLE No. 3 — Showing the Proportion of Tons of Cane Ground by Individual Colonos During the Months of March and April

| Year | Total Cane Individual Colonos | Cane Ground in March and April | Proportion |
|------|-------------------------------|-------------------------------|------------|
| | | | Per Cent |
| 1942.............. .... ..... .......... | 123,706.77 | 57,325 47 | 46.36 |
| 1943............. ...... ... ........... | 131,730 | 58,626.965 | 44.46 |
| 1944................................ .......... | 76,891.6 | 43,057.995 | 55.88 |
| 1945................................ ..... .... | 130,982 | 40,876.365 | 30.75 |
| 1946............................. .......... | 135,260 | 62,142.245 | 45.94 |

TABLE No. 4 — Comparing the Proportion of Cane Ground by Individual Colonos in the Sugar Crops of 1942 to 1946, and Cane Ground During the Months of March and April of Said Years

| Year | Proportion of Individual Colonos | Proportion of Cane Ground March and April | Difference |
|------|----------------------------------|-------------------------------------------|------------|
| | Per Cent | Per Cent | Per Cent |
| 1942................................. .... | 34.73 | 46.435 | 11.705 |
| 1943............... .................... | 41.63 | 46.70 | 5.07 |
| 1944................................... | 36.84 | 39.57 | 2.73 |
| 1945.................................... | 42.82 | 47.03 | 4.21 |
| 1946.................................... | 40.71 | 48 95 | 8.24 |

TABLE No. 5 — Showing the Differences Between the System of Profitable Delivery and the System of Proportional Delivery As to the Final Yielding for the Related Colonos and the Individual Colonos

| Year | Profitable Delivery | Proportional Delivery | Profitable Increase | Increase Directing Colonos | Increase Central | Increase Individual Colonos |
|---|---|---|---|---|---|---|
| 1942........ | 840,303 h. | 835,717 h. | 4,786 h. | 1,230 h. | 120 h. | 3,436 h. |
| 1943........ | 768,572 | 762,325 | 6,247 | 4,082 | (9) | 2,174 |
| 1944....... | 515,451 | 515,134 | 317 | (432) | (85) | 834 |
| 1945........ | 713,925 | 719,134 | (5,209) | (2,769) | (153) | (2,287) |
| 1946........ | 805,239 | 804,917 | 322 | (3,668) | (41) | 4,031 |

TABLE No. 6 — Comparing the Average Income Per Hundredweight of Sugar Produced by Related Colonos and Individual Colonos