MILTON S. KRONHEIM & CO., Inc.

v.

UNITED STATES.

No. 50327.

United States Court of Claims.
July 16, 1958.

F. Joseph Donahue, Washington, D. C., for plaintiff. Donahue & Kaufmann, Washington, D. C., were on the brief.

Rufus E. Stetson, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. James P. Garland, Washington, D. C., was on the brief.

LARAMORE, Judge.

This is a suit to recover income and excess profits taxes paid by plaintiff for the fiscal year ended October 31, 1944. The sole issue before us is whether or not plaintiff is entitled to deduct as an ordinary and necessary business expense [1] the sum of $200,000 which it paid in settlement of the Price Administrator's claim against it for treble damages under the Emergency Price Control Act of 1942.[2]

██ What would otherwise appear to be ordinary and necessary business expenses may be disallowed if their deduction would frustrate sharply defined Federal or State policy. Textile Mills Securities Corp. v. Commissioner, 1941, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249; Commissioner of Internal Revenue v. Heininger, 1943, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171; Lilly v. Commissioner, 1952, 343 U.S. 90, 72 S.Ct. 497, 96 L.

---

1. The Internal Revenue Code of 1939 provides that:
   "In computing net income there shall be allowed as deductions:
   (a) Expenses.
   (1) Trade or business expenses.
   (A) In general.

"All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *." 26 U.S.C. (1946 Ed.) § 23.

2. 56 Stat. 23, as amended, 50 U.S.C.App. (Supp. V, 1940 Ed.) §§ 901–946.

Ed. 769; Tank Truck Rentals, Inc. v. Commissioner, 1958, 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562. Initially, therefore our problem is whether the deduction of an amount paid in settlement of a claim by the Office of Price Administration for treble damages under the Emergency Price Control Act would frustrate sharply defined Federal or State policy. That problem has been resolved by numerous courts, including this one, and the rule has been laid down that:

"No payment to the Administrator made for overcharges in circumstances incompatible with innocence or with reasonable care can be a necessary and ordinary expense. Allowance of the deduction in either of these situations would definitely tend to frustrate enforcement of the Price Control Act.

"Where the payment has been made in circumstances which are inconsistent with intention to violate the Act and inconsistent with a lack of due care to conform to the law it would be an ordinary and necessary expense. Allowance of the deduction in these circumstances could not frustrate the enforcement of the Act." National Brass Works v. Commissioner, 9 Cir., 1950, 182 F.2d 526, 531, 20 A.L.R.2d 590.

To the same effect are Hershey Creamery Company v. United States, 1952, 101 F. Supp. 877, 122 Ct.Cl. 423; Commissioner of Internal Revenue v. Pacific Mills, 1 Cir., 1953, 207 F.2d 177; Rossman Corp. v. Commissioner, 2 Cir., 1949, 175 F.2d 711; George Schaefer & Sons v. Commissioner, 2 Cir., 1954, 209 F.2d 440; American Brewery v. United States, 4 Cir., 1955, 223 F.2d 43; Lentin v. Commissioner, 7 Cir., 1955, 226 F.2d 695 certiorari denied, 1956, 350 U.S. 934, 76 S.Ct. 305, 100 L.Ed. 815; United States v. Star-Kist Foods, 9 Cir., 1956, 240 F.2d 759; Utica Knitting Co. v. Shaughnessy, D.C.N.D.N.Y.1951, 100 F.Supp. 245;

Marantz v. Yoke, D.C.N.D.W.Va.1953, 113 F.Supp. 536; Nemrow Bros., Inc. v. United States, D.C.Mass.1954, 125 F. Supp. 604; Farmers Creamery Co. of Fredericksburg, Va., 1950, 14 T.C. 879; Henry Watterson Hotel Co., 1950, 15 T.C. 902 affirmed 6 Cir., 1952, 194 F.2d 539, and the Commissioner, upon reconsidering the question,[3] has bowed to these decisions and ruled that:

"* * * payments made to the United States for violation of the Emergency Price Control Act of 1942, * * * are deductible as business expenses, under section 23 (a)(1)(A) of the Internal Revenue Code, if the taxpayer proves that the violation was neither willful, intentional, nor the result of the failure to take practical precautions. Rev. Ruling 54-204, Int.Rev.Cum.Bull., vol. 31, pp. 49, 50-51."

The sole question, therefore, which remains for our decision is one of fact, i. e., whether the payment by plaintiff in the instant case was made "in circumstances * * * inconsistent with intention to violate the Act and inconsistent with a lack of due care to conform to the law" and we proceed to examine the evidence and proof before us that bear on this question.

Plaintiff is a wholesale liquor distributor with its principal place of business in Washington, D. C. When price regulation first commenced in 1942, plaintiff entrusted to Bernard Cohen, its chief administrative officer and vice president, the task and responsibility of familiarizing himself with the new regulations and insuring plaintiff's compliance therewith.

The crucial period was March 1942, for the regulations provided that if a seller had sold a commodity during that month, its price was to be fixed at the highest price he had charged for it during the month. If the seller undertook to sell a commodity which he had not sold in March 1942, he was to fix the price for

---

3. Earlier rulings had been somewhat inconsistent with the decisions cited. See Rev. Rulings 1943-21-11554 and 1943-

22-11563, Int.Rev.Cum.Bull., vol. 22, pp. 111-114.

the new commodity at the highest price charged for a similar commodity he had sold during the month which was most nearly like the new one. If he had sold no commodity during March 1942 which could be described as similar to the new one, then his price was to be fixed at the highest price charged by the most closely competitive seller of the same class in March 1942, for the same commodity or for the similar commodity most nearly like it. (See finding 7 and regulations cited therein.)

Mr. Cohen became familiar with these regulations and with others that affected the wholesale liquor business. He was assisted in his work by Mr. Samuel Greenblat, plaintiff's office manager. Both were experts in pricing liquor at wholesale. Together they studied OPA regulations, actions, press releases and interpretations that pertained to their business. They subscribed to services that were designed to keep them informed of the latest developments with respect to price controls.

Cohen and Greenblat prepared a price book which contained a separate page for each brand of liquor which plaintiff had sold in March 1942. On the pages they listed the source of supply, the cost, size, age, proof and other information concerning the particular brand. These were the factors that were considered and used by them, when faced with the pricing of a new commodity, in determining which brand sold in March 1942, was the similar commodity most nearly like the new one.

In November 1942, Mr. Cohen entered the military service. Thereafter, the responsibility for compliance with price regulations rested entirely with Mr. Greenblat. His task was not a simple one. During the period 1942–1943, whiskey was in short supply. There was considerable disappearance from the market of established, well-known brands. Plaintiff was carrying approximately one thousand items of which about 200 constituted new items which it had not carried in March 1942.

When plaintiff marketed a new brand, Greenblat would make a separate page for it, entering the relevant information concerning it, and place it in the price book. He would then compare the characteristics of the new brand which he considered material with those of the brands sold in March 1942, and chose what he considered to be the similar brand most nearly like the new one for purposes of fixing the price on the new brand. On the new brand's page in the price book, he would enter an explanation as to why he had chosen a particular brand for comparison.

Obviously, this procedure called for highly subjective determinations. Frequently, inquiries were made at the local office of the OPA in order to obtain more specific information concerning the regulations. Generally they were advised that the regulations were self-administering and that they were designed for each seller to make his own determination as to the price under the formula set out by the regulations.

In addition to the problem of pricing new brands as they came on the market, the wartime conditions affected the discounts allowed by the plaintiffs. In March 1942, plaintiff allowed a discount on purchases of certain brands when sold in quantities of five or more cases. With liquor scarce, the demands of plaintiff's customers were invariably for more liquor than plaintiff could supply. Plaintiff treated these demands as standing orders and liquor was allotted against these orders as it was received. Because of the shortage of gasoline, deliveries were cut to one or two a month and allotments were accumulated by the plaintiff for delivery at one time. Plaintiff continued to give discounts only on the basis of the number of cases *allotted* at one time and not on the basis of the number of cases *accumulated* and *delivered*. Thus, if a customer had a standing order for 50 cases of a particular brand and plaintiff allotted 2, 3, and 4 cases over a period of time, no discount was given even though nine cases were accumulated and finally delivered to the customer. If, however, plaintiff received enough of a particular brand at one time so that five

or more cases could be allotted against a standing order, the discount was given for that allotment.

In August 1943, Eli Berg, an employee of the OPA, began an investigation of plaintiff's practices in light of the OPA regulations. Plaintiff's employees were instructed to cooperate with Mr. Berg during his investigation and they did so.

Mr. Berg worked on plaintiff's premises for two or three weeks. He made an audit of plaintiff's books which covered three months of plaintiff's operations: March, April, and June 1943.

As a result of his investigation, Berg reported to his superiors that plaintiff had, in his opinion, made overcharges during the three months covered by his audit amounting to a total of $76,802.85. $25,121.81 of this figure represented alleged overcharges resulting from the plaintiff's policy with regard to discounts which Berg considered violative of the regulations. The remaining $51,681.04 represented alleged overcharges resulting from the comparison of what Berg considered noncomparable brands in determining the price of certain new brands sold during the audit period.

The OPA's position with regard to plaintiff's practices was made known to it. Both plaintiff and the OPA indicated a willingness to settle the matter without the necessity of litigation. A number of negotiation meetings were held between plaintiff's counsel, Mr. Alvin Newmeyer, and Mr. John L. Laskey for the OPA. Mr. Carl W. Berueffy, a subordinate to Mr. Laskey, was also present at two or three of these meetings.

During these negotiations, it was the position of the OPA that they were entitled to treble damages for the violations discovered and that the plaintiff's violations had been willful.[4] This position was made known to plaintiff and its counsel during the negotiation proceedings. On the other hand, plaintiff and its counsel took the position throughout these negotiations that none of the practices of which the OPA complained were violative of the regulations or law and that plaintiff was entirely innocent of any violations.

The OPA's claim was settled for $200,000 pursuant to an agreement entered into between the parties on December 7, 1943, which, in pertinent part, reads as follows:

"AGREEMENT IN SETTLEMENT OF THE PRICE ADMINISTRATOR'S CLAIM FOR TREBLE DAMAGES UNDER THE EMERGENCY PRICE CONTROL ACT OF 1942

"This agreement is predicated upon an investigation by agents of the Office of Price Administration and upon information voluntarily submitted by Milton S. Kronheim & Son, Inc., hereinafter referred to as the corporation;

"Whereas, as a result of the investigation and of examination of the information supplied by the corporation, it appears that quantity discounts on sales of liquor customarily allowed in March of 1942 were discontinued during the period from January 1 through March 31, 1943, which elimination of discounts is

---

4. Under the law as it existed at the time of these negotiations, the Price Administrator had a cause of action for treble the amount of any overcharges regardless of their character, i. e. whether they had been made innocently or willfully. 56 Stat. 33, 50 U.S.C.App. (Supp. II, 1940 Ed.) § 925(e). However, the Administrator felt that he had discretion, under the law, to seek or accept less than treble damages and it was his policy to settle for less in cases where he was satisfied that the violations had been neither willful nor the result of a failure to take practicable precautions to comply with the law. See Rossman Corp. v. Commissioner, supra, 175 F.2d at page 714; Hershey Creamery Company v. United States, supra; National Brass Works v. Commissioner, supra. This policy was enacted into positive law in 1944 when section 925(e) was amended to provide for single damages only "if the defendant proves that the violation of the regulation, order, or price schedule in question was neither wilfull nor the result of failure to take practicable precautions against the occurrence of the violation." 58 Stat. 632, 640.

claimed by the Office of Price Administration to be the equivalent of a price increase and to have thereby resulted in overcharges for the period in question in the sum of $25,121.81, and

"Whereas, examination of the corporation's books and records and other information supplied by the corporation has resulted in the claim by the Office of Price Administration that the corporation since November 1942 has exceeded applicable price ceiling regulations in connection with products sold by the corporation and that the overcharges so made amount to the sum of $51,681.04, and

"Whereas, the Office of Price Administration has asserted a claim against the corporation on behalf of the Price Administrator and pursuant to the Emergency Price Control Act of 1942 for three times the amount of the alleged overcharges above referred to, and

"Whereas, the claims asserted on behalf of the Price Administrator are all civil in nature and are disputed by the corporation, and

"Whereas, the parties hereto mutually desire to adjust and settle the claims asserted on behalf of the Price Administrator without the necessity of litigation.

"Now, therefore, it is agreed that the claims of the Price Administrator through the Office of Price Administration against the corporation for overcharges in the sales of wine, spirits, and liquor to the date of this agreement are settled, released, and forever discharged in consideration of the agreement of the corporation to pay to the Treasurer of the United States the sum of $200,000.00 to be paid in sixteen monthly instalments * * *."

Plaintiff's counsel who negotiated this settlement testified that it was executed by plaintiff upon his strong recommendation in order to save plaintiff the expense, vexatiousness and publicity which would necessarily have attended any litigation of the dispute. He testified further that at no time did he consider that any of the plaintiff's practices had violated OPA regulations and that he had consistently denied during the negotiations that there had been any violations.

These are the primary facts and circumstances surrounding plaintiff's $200,000 payment which it now asserts was properly deductible as an ordinary and necessary business expense. Unfortunately, the record upon which we must base our conclusions is not as satisfactory as might be desired. The testimony was not taken until some 13 years after the occurrence of the events, the significance of which we must determine. Plaintiff called as witnesses Cohen and Greenblat, who had been in charge of its pricing policies during the period, Newmeyer, the attorney who had represented it during the settlement negotiations, and the president of the corporation. Their memory of many details was blurred by the passage of time. The Government found itself in an even more difficult position. It was only able to introduce the testimony of a single witness, Mr. Berueffy, an attorney with the OPA who had been present at two or three of the negotiation conferences with plaintiff's attorney and who had done work on the case for the OPA. However, the two key figures who had handled plaintiff's case for the OPA did not testify, it being stipulated that, had they been called as witnesses for the Government, they would have been unable to testify as to the facts in the case because of their lack of memory of such facts. These were Mr. Laskey, who had negotiated the settlement for the OPA, and Mr. Berg, who had investigated plaintiff's practices and made the audit of their books in 1943. In addition, plaintiff was unable to locate the price book which it had kept during the period and the Government did not place in evidence the audit which Mr. Berg had made. However, we are satisfied that plaintiff has sufficiently carried its burden of proving its entitlement to

deduction by showing that the violations alleged by the OPA were either (1) not violations at all, or (2) to the extent that there were violations, they did not result from any willful conduct on plaintiff's part or from its failure to take practicable precautions to comply with the law.[5]

We need not belabor ourselves with weighing the evidence as to the alleged violations which we have described; all the evidence as to what these were comes from the plaintiff's witnesses and is absolutely uncontradicted by the defendant.

As to the discount policy, we have no hesitancy in saying that it was no violation at all in view of the interpretation of the law which the OPA itself made in this regard.[6]

---

5. Both before the trial commissioner who heard this case and before us, plaintiff has insisted that the burden of proof, under the circumstances of this case, was improperly placed upon it. There can be no question that in the usual case of this type, in order to obtain a deduction, the burden is on the plaintiff to show that the violations for which its payment was made were nonwillful and did not result from its failure to take practicable precautions to comply with the law. American Brewery v. United States, supra 223 F.2d at page 46; National Brass Works v. Commissioner, supra 182 F.2d at page 550; Henry Watterson Hotel Co., supra 15 T.C. at page 906; Nemrow Bros., Inc. v. United States, supra 125 F.Supp. at page 605.

Plaintiff concedes so much, but asserts that since in this case there has never been a finding or determination that there had been violations and since the settlement by plaintiff cannot constitute an admission of violations by plaintiff under ordinary rules of evidence, no burden rests on the plaintiff to show the nonculpable character of its practices unless and until the Government shows that there were violations of some sort.

We appreciate the difficulty of requiring anyone to show the innocence and virtue of his general conduct when he does not have before him any precise charges of misconduct. However, we are also aware that, in a tax case, the burden is on the taxpayer to show his entitlement to a deduction in view of the presumption that the Commissioner's denial of the claimed deduction is correct. This is a tax case and we therefore think that the trial commissioner was correct in placing the initial burden upon the taxpayer. However, in considering what evidence is sufficient for the taxpayer to carry this burden, we, of course, take into account the impossibility of requiring the taxpayer to read the Government's mind (as to violations it may have uncovered but not imparted to plaintiff) or to prove that its entire operation was free from blame in every respect over the period of time involved.

Rather, we require no more from the taxpayer than what it has done, i. e., prove that the alleged violations of which *it had knowledge* and for which *it understood the settlement to have been made* were either not violations at all or that any violations that did occur were of a non-culpable character. Having done so much, the burden would shift to the Government to show the contrary or to introduce evidence of additional violations of a culpable nature.

6. Interpretation No. 3 to Maximum Price Regulation 193 issued February 27, 1943 provided:

(d) March 1942 discounts. A quantity discount schedule used by a distributor in March 1942 must be kept in force, irrespective of rationing and even though the over-all volume of the distributor's business has been reduced. Thus, if a distributor granted a quantity discount for five case purchases in March 1942, he must continue to give the same quantity discount to a purchaser entitled to a five case allotment under a rationed plan where he buys that quantity under circumstances that would have entitled him to the discount in March 1942. However, if the distributor's rationing plan results in an allotment of only four cases to such purchaser, the purchaser would *not be entitled to the five case discount* even though he may have ordered a five case quantity.

(e) Accumulation of allotment. Question has arisen as to whether a purchaser may accumulate his allotment for several delivery periods in order to secure in one delivery a quantity sufficient to entitle him to an extra discount. For example, if a distributor previously allowed a discount for fifteen case purchases but now delivers only five cases per month, may the purchaser order fifteen cases at one time with delivery at the end of the three months so as to secure the discount applicable to that quantity? In such instance, the purchaser is, in effect placing three orders for five cases with delivery at one time and not one order for fifteen cases; therefore, the seller, is not re-

Insofar as the use of noncomparable brands for pricing is concerned, the alleged violations amounted to no more than a difference of opinion between the agents of plaintiff and defendant in an area requiring choices and determinations of the most highly subjective type. If the plaintiff was wrong in one or more of its choices (and we cannot say that it was), its error was a bona fide mistake in judgment which can hardly be characterized as a "willful" violation or disregard of the law. (See finding 16.)

Finally, as we have indicated, plaintiff spent considerable time and effort in attempting to comply with the difficult and complex maze of regulations by which price control was accomplished. If violations resulted, despite its efforts, they did not occur as a consequence of plaintiff's failure to take practicable precautions to comply with the law.

So much having been established by plaintiff's evidence, the burden shifted to the Government to rebut the plaintiff's case. We do not think the Government has sustained that burden.

In opposition to the plaintiff's evidence and the above conclusions which seem to us inevitable therefrom, the Government relies upon two points: (1) that the settlement agreement itself was an admission by plaintiff that it had been guilty of culpable violations of the OPA regulations; and (2) the testimony of Mr. Berueffy that he considered the alleged violations to have been willful at the time of the negotiations, and that the

Government representatives took the position during these negotiations that the alleged violations had been willful.[7]

With respect to the settlement agreement, the Government argues that the $200,000 paid by plaintiff was a rounded-out figure based on three times the alleged violations discovered (and referred to in the agreement) for the three months investigated; that, by settling for three times the amount of the alleged violations, plaintiff admitted that the violations, were willful; that, although the settlement on the basis of treble damages does not create a conclusive presumption of willful violations, it is nevertheless strong evidence of willfulness.

The Government's conclusion that the $200,000 figure was based upon approximately three times the alleged violations discovered for the 3-month period is founded upon the testimony of its single witness to the effect that that was how he understood the figure was arrived at by Mr. Laskey for the Government and Mr. Newmeyer, plaintiff's attorney. Mr. Newmeyer's testimony, however, is in direct contradiction. He testified that the figure was based upon the 3-month figure projected singly over the approximate 1-year period for which plaintiff obtained release by the terms of the agreement.

Frankly, upon the basis of the figures, the one explanation seems quite as likely as the other. However, we do not think that the evidentiary significance to be accorded the settlement agreement is governed by any such calcula-

---

quired to give the fifteen case discount. This interpretation issued prior to the investigated period in the present case describes exactly the policy followed by the plaintiff in regard to discounts. Later, in August 1943, the requirement of maintaining a discount policy based solely on quantity purchases was abandoned by the OPA. See Maximum Price Regulation No. 445, § 5.2(d) (1).

7. Mr. Berueffy also testified that, in addition to the alleged violations for the discount practice and the use of noncompar-

able brands, plaintiff had used prices which had not been used by it during the base period. The witness was unable to state, however, what, or how many, particular brands were involved in such violations or what percentage of the alleged violations resulted from this alleged practice. Plaintiff's witnesses, on the other hand, absolutely denied that any such violations had been made by it, mentioned by the Government or discussed in the negotiation proceedings. The evidence is insufficient for us to conclude that any violations of this type occurred.

tions. Rather, we think that it is clearly settled in law that a compromise agreement in and of itself cannot constitute an admission of liability by the compromiser unless, within the agreement, there are independent admissions of fact by the comprising party. Hawthorne v. Eckerson Co., 2 Cir., 1935, 77 F.2d 844; National Battery Co. v. Levy, 8 Cir., 1942, 126 F.2d 33, certiorari denied 316 U.S. 697, 62 S.Ct. 1294, 86 L.Ed. 1767; Wigmore on Evidence (3d Ed.), vol. IV, §§ 1061–1062. The reason for the refusal of the courts to infer an admission of liability from the mere fact of a compromise or settlement lies both in the policy of the law to encourage settlement of litigation and in the realization that it is often more advantageous, economical and desirable for a party to "buy his peace" than to go through litigation even when his chances of eventually prevailing are great. The settlement agreement before us specifically and expressly provides that the claims of the Government "are disputed" by the plaintiff. No admission of liability was, therefore, intended by the plaintiff; none was made, and none can be inferred from the fact of the settlement under the principles discussed above.

As for the Government's reliance upon the testimony of its witness that he considered the violations willful at the time of the negotiations and that the Government representatives took the position that they were willful during the negotiations, the question as to the precise weight to be accorded such testimony was before the First Circuit in Commissioner of Internal Revenue v. Pacific Mills, supra.

In that case, at one conference leading to the settlement between OPA officials and the plaintiff, the regional enforcement attorney for the OPA said that in his opinion the taxpayer had not taken all practical precautions to comply with the regulations. Wherefore he said that pursuant to OPA policy he would have to insist upon a settlement in excess of single damages for the period involved. The taxpayer's principal negotiator

agreed to "go along with a settlement" on the basis outlined by the OPA. The Tax Court found that the taxpayer's violations had not resulted from a failure to take practical precautions to comply. On appeal, the Government urged that the Tax Court had failed to accord proper weight to the opinion of the OPA official. The court answered (Commissioner of Internal Revenue v. Pacific Mills, supra 207 F.2d at pages 183–184):

"  *  *  *  the Commissioner asserts that the Tax Court erred in its ultimate conclusion because it did not 'accord proper respect' to what he calls the 'Administrator's judgment' that Pacific Mills had failed to take practicable precautions. The short answer to this contention is that the Administrator never passed judgment on the question of the precautions taken by the taxpayer to comply with the regulation. All that appears is that the local enforcement attorney in the course of conferences leading up to settlement expressed his opinion that Pacific Mills had failed to take practicable precautions. Certainly a tactical position taken by local counsel in settlement negotiations is not an administrative determination of any sort. It is at the most only an accusation by a subordinate official, and an accusation, even one made by the Administrator himself, when unsupported by evidence taken at a hearing at which the accused was at least given opportunity to appear *is not even the slightest positive evidence of guilt under any rule of law of which we are aware.*" [Emphasis supplied].

We entirely agree.

In short, we have been required in this case to resolve a factual dispute. We had to make that resolution, of course, upon the basis of the record and the evidence before us. We simply cannot "take the word" of the Government as to what the facts were. We have examined that record and that evidence with care and can only conclude, as a matter of fact, that the payment made by plaintiff in the

present case was made "in circumstances which are inconsistent with intention to violate the Act and inconsistent with a lack of due care to conform to the law." Plaintiff is therefore entitled to deduct its payment as an ordinary and necessary business expense under the authorities to which we have previously referred.

Judgment will be entered for plaintiff with interest thereon as provided by law, the amount of plaintiff's recovery to be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

MADDEN and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting).

I am unable to agree with the opinion of the majority.

The Office of Price Administration asserted a claim against plaintiff for overcharges in the amount of $76,802.85, and it also threatened to assess plaintiff with treble damages. Three times the amount of the overcharges asserted was $230,408.43. The claim was settled for $200,000.00, which is a little over 86 per cent of treble damages.

Putting to one side the testimony of witnesses who participated in this settlement, the settlement agreement itself leaves no doubt that this $200,000 was paid in settlement, not only of the overcharges asserted, but also of the treble damages claimed. The settlement agreement sets out in the first two paragraphs the overcharges asserted, and then in the next paragraph it recites:

"*Whereas,* the Office of Price Administration has asserted a claim against the corporation on behalf of the Price Administrator and pursuant to the Emergency Price Control Act of 1942 for three times the

amount of the alleged overcharges above referred to, and * * *"

And the agreement then reads:

"*Now, therefore, it is agreed* * * *.1*"

This means, in consideration of the premises set out above, to wit, the overcharges asserted and the assertion of a claim for treble damages, the settlement was agreed upon.

I cannot but conclude, therefore, that the $200,000 was in settlement, not only of the overcharges asserted, but also of the treble damage claim.

The majority opinion in note 4 states, "it was his [the Administrator's] policy to settle for less [less than treble damages] in cases where he was satisfied that the violations had been neither willful nor the result of a failure to take practicable precautions to comply with the law." Cases are cited in support of the statement, and I understand the statement to be true. It follows, therefore, that when the Administrator asserted a claim for treble damages he did so on the premise that there had been a willful violation of the law, or a failure to take practicable precautions to comply with the law. While the plaintiff denied the willfulness charged, nevertheless, it paid $133,197.15 in settlement of this charge. The majority opinion concedes that if the violation was willful, plaintiff is not entitled to deduct the amount paid as an ordinary and necessary business expense. I think we are compelled to hold that it was willful.

For these reasons I am unable to agree with the majority opinion. I think plaintiff's petition should be dismissed.

JONES, Chief Judge, took no part in the consideration and decision of this case.

---

1. The majority opinion states that we cannot take into consideration the compromise entered into. I think they are mistaken in this. The prohibition is against taking into consideration offers to compromise. It is nowhere held that you cannot take into consideration the recitals of an executed compromise agreement. Wigmore on Evidence, Vol. IV, sections 1061–1062.