**UNITED STATES of America,
Plaintiff,**

v.

**BEATRICE FOODS CO., Defendant.**

**No. 4–70 Civ. 459.**

United States District Court,
D. Minnesota,
Fourth Division.

June 16, 1972.

See also 322 F.Supp. 139.

106

Robert G. Renner, U. S. Atty., by Neal J. Shapiro, Asst. U. S. Atty., Minneapolis, Minn., together with H. Robert Field, and James E. Corkey, Dept. of Justice, Washington, D. C., appeared for plaintiff.

Winston, Strawn, Smith & Patterson, by Ronald Butler, Chicago, Ill., appeared for defendant.

NEVILLE, District Judge.

The government has brought this civil enforcement action at the instance of the Federal Trade Commission (FTC), seeking monetary penalties and other relief from the defendant Beatrice Foods Co. (Beatrice) for alleged violations of a Federal Trade Commission order which was the product of negotiations between the parties during the pendency of an appeal by defendant from an earlier adverse FTC order. The government moved for summary judgment on the issue of as to whether violations occurred, with the thought that if the motion be granted, the parties and the court should

contemplate further proceedings relative to penalties to be imposed or other relief to be granted. Penalties for violation of FTC orders are provided in the Federal Trade Commission Act, 15 U.S.C. § 45 (l); and in the Clayton Act, 15 U.S.C. § 21(l). Jurisdiction is found under 28 U.S.C. §§ 1337 and 1345; venue under 28 U.S.C. § 1395 and 15 U.S.C. § 22. For the reasons stated below, the motion of the government should be granted on both counts of the complaint.

The case arises from a protracted proceeding before the FTC, In the Matter of Beatrice Foods Co., FTC Docket 6653. A complaint filed in 1956 there charged that Beatrice, a distributor and processor of milk and allied products among other things, had violated Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45, by acquiring numerous companies engaged in various facets of the dairy industry. The hearing examiner filed an initial decision and order on March 2, 1964, wherein he found that five of the acquisitions complained of constituted violations of the Clayton Act. He recommended divestiture of four of those companies and a ten-year prohibition on future similar acquisitions.

Beatrice appealed the examiner's order. The FTC confirmed his findings on April 26, 1965 and entered a substantially similar final order on December 10, 1965.[1] Beatrice then sought review in the United States Court of Appeals for the Ninth Circuit. While the appeal was pending, negotiations between the parties resulted in a joint motion to the Circuit Court recommending entry of an agreed order by that court. The appeals court granted the motion on May 23, 1967, some 11 years after initiation of the original proceeding and on June 7, 1967, the FTC issued a modified order identical with that of that court.[2]

Two sections of the final order are the focus of the instant case, parts I and III which read in pertinent part as follows:

[Part I]

Beatrice Foods Co., ('Beatrice') within a period not exceeding (18) months from the effective date of this order, unless extended, shall *divest itself absolutely and in good faith* to a purchaser approved in advance by the Commission of all plants which are *owned in whole or in part by Beatrice* or operated by Beatrice *at . . . . Albuquerque, New Mexico; . . .* and which are engaged in the manufacturing, processing or distribution of pasteurized and homogenized milks, buttermilk, skim milk, cream, half and half, sour creams, cottage cheese, ice cream, ice milk, mellorine-type products, sherbet, or water ices. . . .

[Part III]

*Beatrice shall cease and desist,* for a period of ten (10) years from the effective date of this order *from acquiring, directly or indirectly, any interest in any firm,* corporate or noncorporate, engaged principally or as one of its major commodity lines at the time of such acquisition in any state of the United States or in the District of Columbia in the business of manufacturing, processing *or distributing at wholesale or at retail milk* or any of the products described in Paragraph I of this order, without the prior approval of the Commission. [Emphasis added]

Count I of the complaint here charges that during the 10 year operative period of the order, Beatrice entered into a group of transactions involving a certain Maple Island Dairies, Inc. of Minnesota, which resulted in an acquisition or acquisitions violative of Part III of that order.

---

1. The complaint, initial decision and Commission opinion are reported in 67 FTC Decisions 473–734. The December order and accompanying opinion are reported in 68 FTC Decisions 1003–08.

2. There is controversy as to the date the last FTC order became final. For purposes of this motion the government accepts defendant's date of June 7, 1967.

By Count II the government charges that Beatrice's failure to divest itself of its corporate stock interest in the Valley Gold Dairy of Albuquerque, N.M. within 18 months from the date the order became final was a violation of the order. Although the Valley Gold Stock eventually was sold, the government claims the divestiture was not timely.

Resisting the government's motion, Beatrice claims essentially that, as to Count I, there are numerous disputed issues of material fact both as to the *nature* of the transactions involved— whether or not anything prohibited was *"acquired"*—and as to the meaning of the term *"interest"* in the consent order (quoted above). As to Count II, Beatrice claims there were *de facto* extensions granted by the FTC and good faith substantial compliance with the divestiture order, and that in any event whether or not there was substantial compliance is an issue of fact requiring a jury decision. In summary, thus, the issues are:

As to Count I, did Beatrice "acquire" an "interest" as a result of its transactions with Maple Island Dairies, Inc.?

As to Count II, was any extension of time for compliance granted and was there "substantial compliance" as a defense to failure to divest within the time presented by the order or any extension thereof?

■■ On a summary judgment motion, where there are disputes as to material fact, the question must be viewed in the light most favorable to the party opposing the motion. As defendant points out there is authority which holds that summary judgment is inappropriate in certain complex antitrust cases where motive and intent are important and credibility is a factor.[3] However, the more apposite line of authority is that which holds that where the gist of the case turns on documentary evidence and involves conclusions of law, summary judgment is proper.[4] Here the evidence is substantial in volume and the transactions were intricate, but there is no dispute over the factual events which are represented by documents produced from or by Beatrice itself, only over their characterization within the meaning of this FTC order. The issue it seems to the court is not, for example, did Beatrice *intend* to acquire an interest in another company, but rather was an interest acquired.

## COUNT I

The undisputed facts of the transactions underlying Count I are as follows:

In the Spring of 1968 Maple Island Dairies, Inc., a milk distributor, concluded to dispose of an unprofitable segment of its business which it called the northern division. That division consisted of four company-owned and operated dairy stores, 11 company owned branch distributors with established routes and 11 independent distributors also with established routes. Maple Island had had prior business dealings with two wholly owned Beatrice subsidiaries, competitors of Maple Island, Russell Creamery Company of Superior, Wisconsin and Russell Creamery Co. of Brainerd, Minnesota, both milk processors and distributors. In a series of meetings to discuss the disposition of Maple Island's northern division, the president of Maple Island, met with the president of Russell Creamery of Superior. A set of transactions resulted, after oral approval in principle by Russells' Beatrice superiors on July 11, 1968, whereby Russell would supply all but a few of the former Maple Island routes. The changeover began September 1, 1968, and a set of transactions was worked out for each distribution point.

3. Norfolk Monument Co. v. Woodlawn Memorial Gardens, 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969); Poller v. CBS, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

4. White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1962). *See generally* text and cases cited in Moore's Federal Prac. § 56.16, especially pages 2452–53.

The company owned routes were converted into independent distributorships. In all but two cases, the new distributors were the former operating employees of Maple Island or an existing independent Russell distributor. In each such case, a meeting was held where the new distributor purchased the assets at the location, including any inventory and accounts receivable. The purchaser made a modest down payment with the remainder being financed by Beatrice.[5] Present at each meeting were the purchaser and representatives of Maple Island and Beatrice. The exhibits attached to the government brief produced from Beatrice show that, typically, at each meeting the former Maple Island employee or existing Russell distributor first executed an "Agreement to purchase", distributorship contract, factor's lien, conditional sales contract and note bearing 7% interest. Contemporaneously, a Beatrice subsidiary executed a check for the balance due after the down payment.[6] Also at each meeting Maple Island assigned all its rights under the distributorship contracts to Beatrice. The assignment was accomplished in each case by a document, signed by Maple Island, Russell and the new distributor, which contained the following recital:

> "For value received, I hereby assign the attached conditional Sales Contract, Factor's Lien, Note, Franchise Agreement of —————— to Russell Creamery Co. . . . ."

As to the 11 independent Maple Island distributors in the northern division, the only assets transferred were 30 day trade accounts owed by them to Maple Island. In six cases, the Beatrice subsidiary issued a check to the distributor who in turn, by prior agreement with Beatrice, endorsed it to Maple Island in payment of outstanding accounts. Four distributors financed their own transfers. One in Amery, Wisconsin, was dropped from the arrangement by mutual agreement.

Also included in the arrangements between Maple Island and Beatrice was a five-year license for use of the Maple Island label. During the period when the transfers were being made, an exchange of correspondence between Russell and Maple Island resulted in a letter (Government Exhibit No. 14, Beatrice Special Report Exhibit II–X–5) which gave that license and is otherwise instructive.

"September 23, 1968

Mr. R. E. Russell
Russell Creamery Co. of Wisconsin, Inc.
1625 Broadway
Superior, Wisconsin 54881
Re: Fluid Milk and Ice Cream Distribution Under Maple Island Label

Dear Mr. Russell:

This will confirm our agreement with you concerning the processing and sale of fluid milk and ice cream products under the Maple Island label to certain independent distributors, company owned branches and dairy stores located in the area north of the Twin Cities, which locations are described on the attached sheet.

Effective September 1, 1968, or as soon thereafter as possible, you are to commence serving these locations direct from your plants at Superior, Wisconsin, and Brainerd, Minnesota, with such sales to be made on an open account basis in accordance with your normal selling terms, as we have previously discussed this matter.

As we informed you, we have decided to discontinue serving these locations, since their location in the area north of the Twin Cities has been unprofitable due to the long hauling distances

---

5. Of the 11 branch offices, the transfer of seven was financed by Beatrice. Two were financed from other sources, one by Maple Island and the eleventh was not transferred. Of the four stores, two were portable and removed, one at Virginia, Minnesota was transferred with the branch office, and the fourth, Grand Rapids, was finally transferred to an existing Russell distributor.

6. All but one of these checks were made payable to Maple Island. One was endorsed to Maple Island by the new distributor.

and the fact that they are mostly in small towns where the growth potential is not large. For this reason, we have also decided to dispose of these company branches and dairy stores to independent distributors and as these disposals are accomplished, we will expect you to continue to serve such accounts and bill them direct, however, in the meantime we will continue to operate these locations.

Since a substantial portion of *this volume is packaged under our Maple Island private label for which a consumer demand has been established,* we hereby agree to authorize you to use such label on the packages now being processed and distributed at these locations for a period of five years from September 1, 1968.

You agree to hold Maple Island, Inc. and its subsidiary companies harmless from any and all claims and losses including costs of defence arising out of the use of our name from and after September 1, 1968. *You also agree that you will do nothing to injure the goodwill of the name or jeopardize its value.*

If this meets with your approval, please sign the extra copy of this letter enclosed and return it to me.

Very truly yours,

MAPLE ISLAND DAIRIES, INC.
By: /s/ D. W. O'Brien
D. W. O'Brien, Vice President"
[Emphasis added]

That letter together with other correspondence and documents clearly shows that the transactions were a "package deal". In addition, various documents from Russell and Maple Island files refer to their "courtship" and to the "disposal" or "sale" of the northern division. As previously noted prior to the transactions Maple Island was a competitor of Russell in many of the towns and cities in the northern division area. Afterwards, only Russell supplied milk to those locations.

While there is no direct indication of the "value received" by Maple Island for its assignments, certain letters and account sheet in the record reveal that after September 1, 1968, Maple Island was charging—and Russell was paying—interest on the unpaid balance of the book value of the physical assets plus a $20,000 upward adjustment. Also, between September 1, 1968 and December 13, 1968, checks totalling about $230,000 were negotiated from Beatrice subsidiaries to Maple Island, either directly or by immediate endorsement from the distributor to Maple Island.[7] At minimum, therefore, with Beatrice providing financing in most cases, Maple Island was able to recover its investments or a substantial portion thereof in the northern division, including its accounts receivable, immediately rather than having to finance the transactions itself or to depend upon the ability of the purchasers to find independent sources of credit. Primarily as a direct result of the arrangement with Maple Island, the annual sales of Russell Creamery of Superior alone increased by some 30%, or by nearly $1 million.

The government asserts that by virtue of the series of transactions described above, Beatrice through its subsidiaries Russell, acquired the sales volume or market share, good will and the beneficial use of the label and other assets of Maple Island, its former competitor in northern Minnesota. The government contends that what was acquired is an "interest" within the meaning of the FTC consent order. Beatrice disputes these assertions, arguing the following issues of material fact:

(1) Whether the word "interest" as used in the negotiated decree is not in fact an ambiguous term and therefore

---

7. See Appendix I, Gov't Brief. Checks in the amount of about $175,000 were made out directly to Maple Island by Russell to finance the purchase of Maple Island owned routes. (The purchasers of the routes made down payments totalling $27,000.) Indirect payments by immediate endorsement totalled some $55,000.

oral negotiations between FTC personnel and Beatrice attorneys and personnel prior to the decree and post decree conduct in relation to other cases should be the subject of an evidentiary hearing to determine as a fact issue the intent of the parties at the time.

(2) Whether as a matter of fact Maple Island sold or transferred no part of its business or operations to Beatrice, which paid no money to purchase anything from Maple Island but rather served only as an available, alternate financing source for the various purchasers and acquired no interest but simply began to supply dairy products where Maple Island had previously; and,

(3) Whether Beatrice acquired any interest in the license for use of the Maple Island label.

Beatrice does not contest that Maple Island was the kind of dairy firm which the order prohibited acquiring. At first blush these assertions might appear to present questions of material fact but upon analysis it is clear they do not.

That the parties dispute the contest and meaning of the negotiations prior to the consent order is clear. The parties also differ as to their characterizations of the arrangement with Maple Island. But a defendant cannot create an issue of *material* fact requiring a jury trial simply by saying over and over that one exists. Defendant's claimed factual issues in Count I either are completely contradicted by a record consisting of documents primarily obtained from defendant's own files and by deposition testimony, or depend upon clearly inad-

missible evidence or are legal conclusions.

Beatrice asserts that issues of material fact are raised concerning the meaning of the word "interest" in the order from statements made by FTC staff personnel during the pre-order negotiations after the original adverse order from the FTC and from the post order conduct of the parties. Regarding the negotiations, Beatrice states that it was assured by FTC staff that "interest" was meant to be narrower in scope than the equivalent language in orders directed at three other major dairy companies.[8] Beatrice officers have so testified in deposition, and defendant asserts that such testimony is admissible to explain an ambiguous term, "interest," in the order, relying on numerous cases it asserts hold that consent orders or decrees are in the nature of private contract and the usual rules relating to use of parol evidence to explain ambiguities apply.[9]

The government strongly opposes consideration of the negotiations behind the order and the court agrees. "Interest" is hardly new in the law. The precise phrase used in the order has been used in another consent decree recently construed by the Supreme Court.[10] Equally significant, the term has a fairly consistent, precise usage in relationship to property, businesses and other things of value.[11] For example, the Restatement, Property § 5 states:

The word 'interest' is used in this Restatement both generically to include varying aggregates of rights, privileges, powers, and immunities, and distributively to mean any one of them.

8. All three other orders prohibited the acquisition of the " . . . stock, share capital or assets . . . " of other dairy firms for a ten year period. In the Matter of National Dairy Products Co. (FTC Docket 6651) Jan. 30, 1963, 62 FTC Decisions 120; In the Matter of the Borden Company (FTC Docket 7129), Jan. 30, 1963, 62 FTC Decisions 130; In the Matter of Foremost Dairies, Inc. (FTC Docket 6495), Mar. 5, 1965, 67 FTC Decisions 282.

9. *E. g.,* Heights Funeral Home v. McClain, 288 S.W.2d 839 (Tex.Civ.App.1956) ; *see generally,* 49 C.J.S. Judgments § 178.

10. United States v. Armour & Co., 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971).

11. See generally 22 Words & Phrases, p. 53 et seq.

Other examples of the consistent use of the term include the following:

> More particularly it [interest] means a right to have the advantage accruing from anything; *any right in the nature of property, but less than title* . . . . Black's Law Dictionary, Revised 4th Edition 950 (1968).

> In a contract of sale of a business providing that vendors agreed to sell and assign to purchaser all other interests which they may have in the business, the word "interest" meant *a valuable property or right, forming a part of the business sold,* a part of said business and its assets.

> The word "interest" when applied to property means the legal concern of a person in the thing or property, or in *the right to some of the benefits or uses from which the property is inseparable.* Parsons v. Parsons, 141 P.2d 559, 561, 193 Okl. 160.

The foregoing clearly indicates that "interest" includes, by definition, the rights transferred here to Beatrice by Maple Island. The license to use the label,[12] the notes, distributorship agreements,[13] sales contracts and factor's liens are all "rights in the nature of property" and valuable rights forming a part of the business and in many instances comprising assets of Maple Island. Whereas before, Maple Island held all rights, privileges, powers, and immunities relating to the assets transferred, after the transfer, Beatrice held some of those rights and the independent distributors held the rest. And while the sales contracts, factor's liens and notes did not give Beatrice title, Beatrice clearly held a security *interest,* i. e., a right of ownership contingent upon the default of the titleholder. Such interests are no less interests within the terms of the order because contingent upon default of the debtor.[14] Perhaps most significant, prior to the transfer, Maple Island had the "rights to the benefits" inseparable from the property transferred, i. e., the sales of its milk to the customers along Maple Island's former routes. After the transfer, Beatrice had those rights at least for the minimum period of the distributorship agreements and the advantage of an established and continuing relationship with the distributors. Beatrice thereby gained access to all or most of the customers—the sales volume [15]—who previously bought milk from Maple Island. The net result was an increase in gross sales of Russell Creamery in Superior alone of nearly $1 million, about 30%.

The transactions thus constitute at least an indirect acquisition of an interest in violation of the order. It is at best disingenuous for Beatrice to contend that the particular "aggregate of rights, powers, privileges and immunities" transferred was not an interest in the milk distribution firm of Maple Is-

---

12. United States v. Columbia Pictures, 189 F.Supp. 153 (S.D.N.Y.1960); Western Geophysical Co. of America v. Bolt Associates, Inc., 305 F.Supp. 1248 (D.Conn. 1969.)

13. The distributorship agreements included provisions that the distributor would handle Maple Island brand products exclusively in a territory described in that contract, giving the defendant first refusal in purchasing the distributor's business, a liquidated damages clause for any violation and a non-competition agreement. A handwritten note on defendant's own copy of a letter of inquiry sent by the FTC (Exhibit 34, Fox deposition Exhibit 41, Defendant's Ex. 14) contains the following notation, "we acquired distributorship contracts from Maple Island."

14. Indeed, artful real estate lawyers have for centuries been creating interests much less valuable than those here transferred in the form of contingent remainders.

15 The only case cited by either party relating to whether sales volume is an asset is that of United States v. ITT Continental Baking Co., Civil Action No. C–1220 (D.Colo. 8/2/71) (Exh. 48). There Judge Winner answered the question in the affirmative, stating, "I find that, particularly in businesses where route salesmen are involved, customer lists have a peculiar value, and that they frequently represent the principal asset of a business. . . . and these assets, the most important of which were sales routes and sales volume, were acquired."

land. The court should look to the purpose of the FTC order, and what it was intended to accomplish.

The United States Supreme Court recently stated in United States v. Armour & Co., 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971):

> "The . . . scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." [Id. at 682, 91 S.Ct. at 1757]

Nothing in the remainder of the final Beatrice order contradicts the construction of the order here made by this court.[16]

▮ Moreover, if the parties had agreed to a consent order which permitted the acquisition of the sales volume of a firm while avoiding the corporate shell and the physical assets, they were certainly capable—after 11 years of litigation and negotiation—of drafting language less broad than that used here. The order is not ambiguous so as to allow admission of parol evidence of the pre-order negotiations. There is no suggestion that the agreement was not integrated in the order. Thus, the negotiations can provide no factual basis precluding summary judgment.

▮ Even assuming ambiguity in the word "interest" *arguendo*, defendant's

contentions are not well founded. As noted 11 years of litigation preceded the modified order, including full hearings on both the question of antitrust violations and as to sanctions imposed. There is a full record of the hearings before the examiner, an opinion of the examiner, and two FTC opinions which provide ample assistance in construing the order, if clarification is needed.

The extensive quasi-judicial litigation before the FTC resulted in 51 pages of findings and an opinion by the Commission, detailing the anticompetitive effects of the mergers and acquisitions typifying the dairy industry in general and Beatrice's own growth in particular. When the modified order was entered by the Court of Appeals by consent, the FTC reiterated its view that the order accomplishes the objective sought in the previous findings and order, namely the prevention of the disappearance of regional dairy firms through acquisition by the multi-market giants such as Beatrice.[17] Thus, if the public record behind the order is consulted, it is clear that the acquisition of the sales volume by Beatrice and the loss of Maple Island as a competitor is the kind of event the order was intended to prevent.

Defendant's cited cases where the contents of negotiations behind an order were allowed are all, with one set of exceptions,[18] civil cases between private

---

16. Paragraph II, 2 of the order reads as follows:

"By these divestitures no interest shall be sold or transferred, directly or indirectly to anyone who is at the time of the divestiture an officer, director, employee or agent of, or directly or indirectly under the control or direction of Beatrice . . . ."

The FTC opinion accompanying the order stated in part:

"In the view of the majority of the Commission the proposed consent settlement achieves in large measure the original objective of the complaint which was to prevent the disappearance from the dairy industry of viable regional dairy companies."

Both paragraph II, 2 and the 10 year acquisition ban are consistent with that purpose and use the same term. Paragraph

II, 2 insures that the divestiture will not be illusory. The identical term is used to insure that other regional dairy companies will not be acquired. Defendant's construction would permit an illusory ban on acquisitions.

17. *Compare* 68 FTC 1007 *with* page 3 of the opinion of the FTC accompanying its modified order of June 7, 1967 (quoted page 12, n. 16, *supra.*)

18. United States v. Star-Kist Foods, Inc., 240 F.2d 759 (9th Cir. 1956); Commissioner of Internal Revenue v. Pacific Mills, Inc., 207 F.2d 177 (1st Cir. 1953); Milton S. Kronheim & Co. v. United States, 163 F.Supp. 620, 143 Ct.Cl. 390 (1958); American Brewery, Inc. v. United States, 223 F.2d 43 (4th Cir. 1955), rev'g 126 F.Supp. 477 (D.Md.1954).

individuals and are either divorce cases or relate to issues of *res judicata* or collateral estoppel, clearly different from that here where the issue is: What does the order prohibit the defendant from doing?; not what was decided. With the one exception described below no cases have been cited, and this court's research has revealed none, in which any court has accepted evidence relating to the negotiations between the staff of a public agency and a respondent in interpreting an order by the agency.

The exception is a line of tax cases involving prior efforts by the Office of Price Administration to recover overcharges and statutory penalties for violations of price control regulations. The OPA claims were settled by negotiation resulting in payment of a sum of money and the issue before the court in the tax cases was the deductibility of the payments. Deductibility turned on whether the payments included amounts for treble penalties which would indicate "willful" violation of the price control regulations, the deduction of which would not be allowable. The courts in each case admitted testimony regarding pre-decree negotiation as well as other evidence on the issue of willfulness. These tax cases are not on point. The issue in those cases was akin to a *res judicata* problem, namely what issues were submitted and decided. Here the issue is the interpretation of the agency or court order.[19] One case which points to the proper resolution of this issue is Gila Valley Irrigation District v. United States, 118 F.2d 507, 510 (9th Cir. 1941), where the court held that evidence as to negotiations between the parties was in-

admissible in interpreting a consent decree stating:

> Even if we assume that the terms of the decree were ambiguous, contrary to our conclusion, *evidence of negotiations leading up to the decree would not be admissible, for we are concerned not with the intention of the parties as in the case of a contract between them, but the intention of the court as expressed in the decree.* Moreover, if there was an error in the ruling it was not shown to be prejudicial for, in case of an ambiguity, the pleadings [*i. e.*, the official or public record] should be first consulted to resolve the ambiguity. [Emphasis added]

The *Gila Valley* rule appears particularly appropriate here.

The remaining alleged issue of material fact requires only summary treatment. It matters not whether Maple Island "sold" its business to defendant, although there is evidence that suggests a sale was made. The issue, disposed of above, is whether Beatrice *acquired* an interest in Maple Island or its business or assets. The issue as to whether Beatrice may have paid no money to *purchase* anything from Maple Island is similarly irrelevant.[20] The issue is one of *acquisition* by Beatrice whether by direct sale, or an indirect transaction. Clearly, there was a transfer of something of value to Beatrice.

■ As to defendant's alleged lack of interest in the license for the Maple Island label, the law is clear that trademarks and labels are valuable business assets, and defendant's own documents reflect the defendant's belief that the label on a milk product is such.[21]

19. Whether the order here construed is considered a court order or as an order of the FTC would seem to be irrelevant; defendant has suggested no basis for distinction. Since the case was settled during the pendency of the appeal to the Circuit Court, however, it appears accurate to consider the order here as the order of the court, to be construed as other consent judgments.

20. Already noted is the recitation of "for value received", the transfer of more than $230,000 from Beatrice to Maple Island, either directly or through the distributors, and the payment of interest by Beatrice's subsidiary to Maple Island.

21. The letter of agreement (quoted in full, *supra*, pp. 6, 7) signed by Beatrice sub-

The court thus concludes that as to Count I there are no issues of material fact, and summary judgment is proper.

## COUNT II

■ Summary judgment is even more clearly proper as to Count II. Part I of the consent order required Beatrice to divest itself within 18 months ". . . of all plants which are owned in whole or in part by Beatrice or operated by Beatrice at . . . Albuquerque, New Mexico; . . ." as part of the divestiture of a group of plants in the American Southwest. Defendant owned an 18½% stock interest in the Valley Gold Dairy Co. of Albuquerque, which was not divested until late 1969 or early 1970. The 18 month period expired on December 7, 1968. Defendant divested all of the other Southwest plants to a single purchaser. Following that action and in March, 1969, the FTC notified Beatrice that it was still obliged to divest the Valley Gold stock. A series of letters and conferences with FTC staff ensued. After denial by the FTC of defendant's request for an extension until August 1970, Beatrice formally requested the FTC approval of a purchaser for the stock in a letter received by the FTC on January 2, 1970. The government contends the divestiture was untimely as a matter of law. Defendant's contentions resisting the government position are considered *seriatim.*

Beatrice first argues that a jury must determine whether its stock interest was a "plant" within the meaning of the order, either because a stock interest is not literally a plant or because it was under- stood that Beatrice had to acquire all of the Valley Gold stock before the order was applicable to that interest. The order itself, however, speaks of plants owned ". . . in whole or in part . . ." in Albuquerque. Defendant's answer admits that it was required to divest itself of its interest in the Albuquerque Dairy plant within 18 months. The record reflects no other interest of any kind in any other dairy business in Albuquerque. Footnote 2 on page 2 of the FTC opinion of June 7, 1967 (which accompanied the consent order) states:

"Beatrice is also divesting the Valley Gold operations in New Mexico . . . ."

A booklet describing defendant's "Southwest Dairy Operations" and submitted to the FTC on 10/18/67 as part of defendant's compliance report contains the following statement (Exh. 60, p. 22):

"Beatrice is offering its wholly-owned southwestern dairy operations as outlined above for sale at a price of $6,272,519. In addition Beatrice's 3,458 shares of Valley Gold common stock are available for purchase at $636,686. Pursuant to agreement with the Federal Trade Commission, the dairy properties are offered as a unit to a single purchaser."

Finally, if more proof be needed, defendant's own internal memorandum for Beatrice of July 16, 1969, from General Attorney John P. Fox, Jr. to William Karnes states:

You are familiar with *the fact that* as to the divestiture provision of the consent decree in the Merger Case, *Beatrice is still under the obligation to*

sidiary is an example. Relevant excerpts include the following:

"Since a substantial portion of this [sales] volume is packaged under our Maple Island private label *for which a consumer demand has been established* . . . ."

"You [Russell] also agree that you will do nothing to injure the *goodwill of the name* or jeopardize *its value.*" [emphasis added]

Attached as an exhibit to defendant's compliance report to the FTC for 1970 is a letter to all dairy plant division managers, dated 6/11/70, which states defendant's then current policy on private label agreements. The letter states in pertinent part,

"Where Beatrice is having another processor or manufacturer custom pack Meadow Gold or our label products, we should have a similar written agreement to protect our valuable *trademarks* and reputation for quality." [Emphasis added]

*dispose of our interest in Albuquerque.* This of course means some arrangement relative to our *3,458 shares of Valley Gold stock* (18.5% of the outstanding shares.)  [Emphasis added]

In the face of such overwhelming documentary evidence, for defendant now to contend that its Valley Gold stock was outside the consent order is quite without merit.  The only evidence offered to support this position is the fact that Beatrice and the then principal stockholder of Valley Gold had discussed, prior to the entry of the consent order, defendant's possible acquisition of his majority interest.  The fact of such negotiations does not contradict the clear interpretation of the order as evidenced by the order itself, the accompanying FTC opinion, Beatrice's compliance report, and defendant's own internal memorandum.  The first indication that the Valley Gold interest might not be subject to the order—anywhere in the record—was in defendant's briefs on the instant motion.  As a matter of law the divestiture order clearly applies to the Valley Gold stock; there is no issue for a jury raised on this point.

■■■■ Equally groundless is defendant's contention that it's efforts to dispose of the Valley Gold stock were in good faith and that a good faith effort to comply with the terms of the order is a complete defense.  Assuming such good faith *arguendo*, that issue was passed upon by this court in a previous order, United States v. Beatrice Foods Co., 52 F.R.D. 14 (D.Minn.1971), where it was stated:

. . . while good faith is not a defense to such an action, it is clearly relevant to the court's discretionary determination of the extent of civil penalties to be assessed under that provision.  United States v. H. M. Prince Textiles, Inc., 262 F.Supp. 383, 388–389 (S.D.N.Y.1966);  United States v. Vitasafe Corp., 212 F.Supp. 397 (S.D.N.Y.1962), *aff'd* 352 F.2d 62 (2d Cir. 1965).  52 F.R.D. 14, 18.

Similarly, defendant's arguments as to the alleged difficulty or impossibility of divesting the stock may have carried weight behind a request to modify the order, but they are not a defense to the action here.[22]  Moreover, defendant did in fact divest.  Whether its negotiations over price with the ultimate purchaser were reasonable is irrelevant to whether the stock was *timely* divested.  The good faith language in the order clearly applies not to defendant's *efforts* to divest, but to a requirement of actual rather than illusory divestiture.  Neither the order itself nor its public record background, suggests anything to indicate that defendant's divestiture obligation under the order was to be affected by the price defendant received, and defendant's position in being forced to sell is no defense.  Defendant's bargaining position may have been weakened by virtue of the order.[23]  But any unequal bar-

22.  St. Helen v. Wyman, 139 F.Supp. 545 (N.D.Calif.1956), is not apposite.  There the issue was whether the good faith attempts of certain army personnel to notify persons responsible for discharge of a soldier whose discharge had been temporarily restrained by a court were a defense to claims based on violation of the restraint.  The case is distinguishable on three grounds.  Firstly, the time within which the requisite notice could be given was apparently extremely short whereas here, defendant had more than 18 months to comply.  Secondly, the restraining order was an attempt to maintain the status

quo for a short time until the main issue could be litigated, under the court's general equity powers;  good faith would be relevant to an equity claim.  Here the order was the considered and negotiated product of 11 years of litigation, consented to by defendant.  Thirdly, there were procedures established for modification of the order and time to use them if the difficulties were insuperable.

23.  Two cases cited by defendant as authority for its claimed defense of inability to comply, Healey v. United States, 186 F. 2d 164 (9th Cir. 1950), and Federal Trade

gaining position is the product of defendant's earlier found violations of the antitrust laws and the resultant order consented to by defendant. Having consented, defendant may not now indirectly attack the order.[24] Here, defendant expected to get a price it desired. Because the ownership of the majority of the Valley Gold stock changed due to a death, leaving those expectations unfulfilled, defendant cannot now claim "foul". There is no issue of material fact raised by defendant's alleged good faith or inability to comply.

■ Also groundless, is the assertion that by approving the sale of the other Southwest plants as a unit, the FTC impliedly agreed that the Valley Gold stock need not be divested and is therefore estopped from claiming, or has waived its right to claim, that defendant violated the order. Defendant cites no authority, the record is devoid of evidence to support such a claim, and defendant's own internal documents reflect its continuing awareness of its obligation. The fact that Beatrice may have *inferred* briefly that the FTC was no longer interested in the Valley Gold stock is irrelevant. The order makes explicit provision for divestiture. There is no material issue of fact on the issue of waiver or estoppel.

■ Defendant claims that it was given an oral extension of time for compliance by FTC staff until August, 1970. At most, however, the testimony of the defendant's officers supports only the conclusion that FTC staff advised defendant to apply for an extension and that, if one was applied for, the staff would support it. (See Fox deposition, pp. 37–42.) And the record is clear that defendant knew that, however influential the staff may be in FTC decisions, the staff had no authority to make a decision as to an extension. There is no evidence to support either actual or apparent authority in the staff. To the contrary, Beatrice applied formally for a one year extension; the FTC responded formally by granting defendant two months to present a suitable purchaser, until November 15, 1969.[25] There was no one-year extension. It is clear to the court that there is no issue of material fact on this issue.

■ Defendant argues that the FTC letter of September 12th, which gave Beatrice two months to "present a suitable purchaser" for approval, established a requirement less than full divestiture. Since, it is argued, the FTC knew of the negotiations with the ultimate purchaser, and had made inquiry about it, defendant had substantially complied

Commission v. Blaine, 308 F.Supp. 932 (N.D.Ga.1970), are instances where contempt citations were sought for failure to produce documents not shown to be in the possession or control of the defendants. The inability to comply was in each case actual rather than that here, *i. e.*, the result of defendant's desire to get a better price. Similarly, there is no indication here, as in the strike case, Brotherhood of Locomotive Firemen & Enginemen v. Bangor & A.R.R., 127 U.S.App.D.C. 23, 380 F.2d 570 (1967), that the third party whose cooperation was required for compliance was unwilling to deal with the party under the court's order.

24. United States v. Vitasafe, *supra*, and United States Bio-Genics Corp. v. Christenberry, 173 F.Supp. 645 (S.D.N.Y.

1959), *aff'd* 278 F.2d 561 (2d Cir. 1960). The FTC opinion accompanying the consent order states that divestiture of the Valley Gold and other Southwest operations was in place of defendant's Idaho division and part of its Utah division which were ordered to be divested under the appealed order.

25. The government argues that no extension was given by its letter of September 12, 1969, but rather only a period of grace as to enforcement of the order. The text of the September 12th letter supports that contention. Since the government is claiming penalties only for the period after November 15th, however, the court need not determine whether what the Commission did was *de facto* an extension.

with the November 15th deadline. The record belies this claim. The earliest possible presentment of a purchaser was, by any view of the facts, no earlier than the letter to the FTC dated December 19, 1969. That letter indicated agreement with the estate of one Price had been reached. The contracts were not executed until December 24, 1969, however, and a formal request for approval of the FTC was not sent until December 30, 1969, received on January 2, 1970. Whether the suitable purchaser was presented on December 19, 1969, January 2, 1970 or any date between, it is clear that none was presented by the November deadline. The violation of the order, even if considered as extended two months in some manner, clearly occurred and the precise date of presentment is relevant only to the question of penalties. Again there is no issue of material fact, only disputes as to the legal conclusions to be drawn from those facts. Summary judgment is appropriate as to Count II.

CONCLUSION

As the foregoing indicates somewhat *in extenso*, defendant has raised no issue of material fact necessitating a trial. As to Count I, the unchallenged documentary evidence shows that Beatrice "acquired" an "interest" in Maple Island Dairies. As to Count II, the evidence is quite clear that Beatrice's divestiture of the Valley Gold stock was untimely. Both are violations of the order entered on June 7, 1967. Summary judgment in favor of the government on the issue of defendant's liability is therefore appropriate.

On the question of the penalties which should be imposed for the violations of the FTC order by Beatrice, the court should like to hear further from counsel for the parties, before ordering the entry of judgment and accordingly has set a hearing date for consideration thereof in a separate order which has been entered.